GOODRICH v. WALLER.

1. Action—Joinder of Causes—Assignments.
   Causes of action by plaintiffs, sisters of deceased man, to set, aside assignments of interests in his estate to defendant niece were properly joined in order to promote the convenient administration of justice where plaintiffs' interests were similar, representations made to them by niece were substantially identical, and both sought the same relief (3 Comp. Laws 1929, § 13962).

2. Fraud—Presumptions—Inferences—Evidence.
   Fraud will not be presumed and cannot be lightly inferred, but must be established by a preponderance of evidence.

3. Same—Actual Fraud—Intent.
   Actual fraud is intentional fraud practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed.

4. Same—Constructive Fraud.
   Constructive fraud is a breach of legal or equitable duty which the law declares fraudulent because of its tendency to deceive others irrespective of the moral guilt of the fraud feasor.

5. Same—Good Faith—Reliance—Loss to One Party—Benefit to Other.
   False and fraudulent representations are actionable, either at law or in equity, although made innocently and in good faith, where the representations are relied upon and result in loss to the other party and in benefit to the person making them.

6. Trusts—Constructive Fraud—Unmerited Benefits.
   Constructive fraud, a term applied to a great variety of transactions which equity regards as wrongful and to which it attaches the same or similar effects as those that follow actual fraud, has been evolved to designate what is essentially nothing more than the receipt and retention of unmerited benefits.

7. Descent and Distribution—Assignment of Distributive Shares—Funeral Expenses—Consideration.
   Assignments of interests in estate of decedent who had died in a distant State, made by his sisters to their niece who had paid all his funeral expenses upon latter's good-faith representation

Innocent material representation as fraud, see 2 Restatement, Contracts, § 476, comment b.

that the estate was small and she wanted the assignments for reimbursement of funeral and other expenses she had paid and which representation turned out to be false as to the value of the estate, were invalid since they resulted in niece receiving an unmerited windfall which she did not expect when the assignments were executed and assignments were without consideration.

8. SAME—ASSIGNMENTS—CONSIDERATION—FORBEARANCE FROM SUIT TO ESTABLISH WILL.

Forbearance from bringing suit to establish a will of decedent, defendant's uncle and plaintiffs' brother who had died in a distant State, did not constitute sufficient consideration for assignments to niece by her aunts of their interest in decedent's estate where there was no controversy with plaintiffs over an alleged lost will and assignments were not executed in pursuance of any agreement of forbearance on niece's part.

9. SAME—ASSIGNMENTS—CONSIDERATION—CARE OF GRANDMOTHER.

Care and attention bestowed upon defendant's aged grandmother, the mother of plaintiffs and their decedent brother, did not constitute consideration for assignments by aunts to defendant of their shares in decedent's estate where assignments do not appear to have been made for such consideration.

10. COMPROMISE AND SETTLEMENT—FAMILY DISPUTES.

The settlement of family disputes outside of courts should be encouraged.

11. DESCENT AND DISTRIBUTION—ASSIGNMENT—CONSIDERATION.

A valid consideration must be shown for an assignment of an inheritable interest in an estate.

12. SAME—SETTING ASIDE ASSIGNMENTS—FRAUD—UNJUST ENRICHMENT.

A court of equity will intervene to set aside assignments of interests in an estate in order to prevent an unconscionable wrong where notwithstanding evidence does not establish moral culpability on part of assignee it does show constructive or legal fraud upon assignors and to hold assignments valid would result in assignee's receipt of unmerited benefits and being unjustly enriched.

13. APPEAL AND ERROR—CHANCERY CASES—CREDIBILITY OF WITNESSES.

The Supreme Court is not disposed to interfere with the decree of a trial court in an equity case, based upon a finding of fact made after hearing and seeing witnesses, since the trial court is in a better position to judge their credibility and the weight to be accorded their testimony.

Appeal from Kalamazoo; Weimer (George V.), J.  Submitted April 3, 1946.  (Docket No. 22, Calendar No. 43,292.)  Decided May 13, 1946.

Bill by Florence Goodrich and Edna Ickes against Dorris V. Waller to set aside and cancel certain assignments.  Decree for plaintiffs.  Defendant appeals.  Affirmed.

*Howard, Howard & Howard,* for plaintiffs.

*Carroll B. Jones,* for defendant.

Starr, J.  Defendant Dorris Waller appeals from a decree which set aside and canceled certain assignments from plaintiffs to her of their respective interests in the estate of her uncle, Grover Halstead, deceased.

Halstead had moved to California over 40 years ago and died there, intestate, on October 29, 1944. He was a bachelor and left surviving him the two plaintiffs, who were his sisters, and the five children of a deceased brother, one of whom is the defendant. The record indicates that for many years a rather close and affectionate relationship had existed between defendant and her uncle.  They had corresponded quite regularly and she had visited him in California in 1943.  He had often expressed his affection for defendant and had stated to friends and business associates that he intended to have her come to California and make her home with him and that he would leave his entire estate to her.  It appears that Halstead was not particularly intimate with the plaintiffs and that he had expressed no affection for or interest in them.

Upon being advised of her uncle's death, defendant notified the plaintiffs and with their approval

arranged to have his body brought to Michigan for burial. She personally paid all expenses incident to his funeral. Shortly after the funeral defendant received a telegram from her uncle's employer advising her to come to California immediately to look after his estate. She also received a letter from him which stated in part:

"I advise you to come here as soon as possible— the truck is impounded with some of his (Halstead's) tools. There is a daily storage on that. There must be considerable money, and several pieces of property, valuable tools and his car."

Defendant, accompanied by her brother-in-law, went to California the latter part of November and remained there about two weeks. She attempted to locate a will which she believed her uncle had made and to ascertain what property he had left. She was unable to find a will, and she testified that the only property she could locate was two old automobiles, a floor sander, and a planer and equipment. While in California she employed an attorney, who advised her that to avoid the litigation of establishing the will which she believed her uncle had made but which could not be found, she should obtain assignments from plaintiffs of their respective interests in the uncle's estate. The attorney prepared forms of assignment from the plaintiffs to defendant, and when she returned to Michigan, she immediately interviewed plaintiffs regarding their executing the same. As a result of her interviews the plaintiffs executed and acknowledged assignments to her of their interests in the Halstead estate. She thereafter filed the assignments with the public administrator in California who had charge of her uncle's estate.

At about the time defendant was in California investigating her uncle's estate, plaintiffs employed an attorney in Michigan and began their own investigation to ascertain what property there was in the estate. The record does not show what information, if any, they had obtained at the time they executed the assignments in December, 1944. However, about April 2, 1945, they received information from the public administrator indicating that there was a substantial amount of property in the Halstead estate. They immediately demanded that defendant surrender the assignments they had executed, and upon her refusal they began the present suit for cancellation thereof. In their bill of complaint they alleged in substance that their brother, Grover Halstead, had left an estate of $20,000 or more; that there was no consideration for their assignments; that they were induced to execute them by the fraudulent representations of defendant regarding the amount of property in their brother's estate; and that they had made the assignments only for the purpose of enabling defendant to obtain reimbursement for the funeral expenses of her uncle. They asked that the assignments be set aside and canceled and that defendant be enjoined from collecting their respective interests in the estate. Defendant answered, denying the charges of misrepresentation and alleging in substance that plaintiffs executed the assignments after being fully advised of all the facts relating to her uncle's estate of which she had knowledge. She further alleged "that by such assignments plaintiffs avoided litigation over defendant's claims, made a gift, carried out their deceased brother's wishes, paid past family obligations, and were released from liability if their brother's estate proved insufficient to meet expenses." The case was tried, and a decree was

entered canceling and setting aside both assignments and enjoining defendant from collecting the interests of the plaintiffs in the estate. She appeals from this decree.

Defendant first contends that as plaintiffs' causes of action were several, they could not be joined as parties plaintiff in the present suit under 3 Comp. Laws 1929, § 13962 (Stat. Ann. § 27.591), which provides in part:

"The plaintiff may join in one action, at law or in equity, as many causes of action as he may have against the defendant; * * * but when there is more than one plaintiff, the causes of action joined must be joint, * * * *or sufficient grounds must appear for uniting the causes of action in order to promote the convenient administration of justice.*"

We cannot agree with defendant's contention, as each of the plaintiffs had similar interests in the Halstead estate; the representations to them were substantially identical; and they both sought the same relief. The causes of action could properly be joined under the above statute "in order to promote the convenient administration of justice." See *Latimer* v. *Piper*, 261 Mich. 123; *Albaugh* v. *Abbott*, 253 Mich. 588; *Hamilton* v. *American Hulled Bean Co.*, 143 Mich. 277.

The important question in the present case is whether or not plaintiffs established actual fraud or constructive fraud entitling them to cancellation of their respective assignments to defendant. Fraud will not be presumed, cannot be lightly inferred, but must be established by a preponderance of evidence. *Fahey* v. *Pell*, 310 Mich. 280. In 26 C. J. pp. 1060, 1061, §§ 3, 4, it is stated:

"Actual fraud is intentional fraud; it consists in deception, intentionally practiced to induce an-

other to part with property or to surrender some legal right, and which accomplishes the end designed.  *  *  *

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others. *  *  * Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud."

See, also, *Union Guardian Trust Co.* v. *Emery*, 292 Mich. 394; 23 Am. Jur. p. 756.

The testimony is in conflict as to what representations defendant made to plaintiffs in obtaining the assignments of their interests in their brother's estate. Plaintiff Goodrich, who was about 63 years old, testified in part:

"She said she paid all the expenses and things, and she wanted me to sign some papers so that she could get her money back, and I was perfectly willing to do it. *  *  * I wanted her to get her money back. We went to Lawton to have it signed. I didn't read the paper. I didn't have my glasses, and I think I was so nervous *  *  * I couldn't have read it if I had tried. There was a notary there. Dorris (defendant) read it, but I couldn't understand it. *  *  *

"I didn't know I had signed something more than the funeral expenses. *  *  *

"Nothing was said about money affairs, only just to pay the funeral expenses and the money that she spent was what I signed the papers for. *  *  *

"After the funeral *  *  * she told me that she had received a letter from Mr. Snell, the man that he (Halstead) worked for. *  *  * From the letter I gained the information that Mrs. Waller

was the sole legatee of the estate; that she had been willed the property of my brother. She said that she was sole heir of all of the property. * * * She came to my home after she returned from California. * * * Nothing was said about the fact that she couldn't find a will there in California. The only thing said about the business was that she had some papers she wanted me to sign, and she said there was a couple old cars there and a tractor, and that she thought that that would pay the bill that she spent. * * * She said that she actually saw this truck, sander and so forth. Those were things she wanted to sell to get her money back.''

Plaintiff Ickes, who was about 58 years old, testified in part:

''When she (defendant) called me up she asked me if I would come and sign the papers, she told me what the nature of it was. She said that she wanted me to sign the papers that would give them the authority out there in Los Angeles to sell the personal property and the cars so that she would * * * get her expenses for going out there and back and the funeral expenses. * * * She showed me the paper in Lawton. * * * She didn't read the paper to me or tell me the nature of it after we got there. She said she wanted me to sign a paper to assure her that she would get her expenses paid and the funeral,—and all the money she had spent. * * * She said my brother didn't have anything; she doubted that he had enough to pay the expenses. * * *

''I didn't know at the time I signed it that there might be as much as $20,000 of property I was signing away. * * * I certainly would not have signed it if I had known that it was disposing of all my interest in the estate. * * *

''I certainly do claim that I was deceived as to the value of my brother's estate. I also claim that

I was deceived as to the contents of the paper that I signed.''

Defendant gave a different version of her interviews with plaintiffs and of the situation relative to the assignments in question. She testified in part:

"I went to California shortly after the death of my uncle. * * * When I first arrived there I went directly to his home, * * * and * * * I contacted Mr. Snell (the uncle's employer) who advised me to go to the public administrator and to the banks where my uncle had done some business. I also employed an attorney for advice and I did all these three things, but I couldn't find anything we could hang on to. I couldn't find any papers where he owned things. I wasn't given any consideration at the bank as to how much money he had in the bank. * * * There was a 1936 Dodge paneled truck in the garage and it had a floor sander and planer and things that I wasn't familiar with in the line of laying floors and sanding floors, and there was also a 1936 Dodge coupe. * * * I talked at quite length with several men * * * they were friends of his and they thought he had a will. * * * I was advised to have assignments drawn up, rather than to establish a will, because there were three men who were willing to witness to that effect, but * * * the attorney out there * * * decided it would be better to avoid any lawsuits or any further legal procedure to have the assignments made and have my aunts sign them. * * * When I returned to Michigan I first went to see Aunt Florence (plaintiff Goodrich). * * * I told her the nature of my visit was to have her assign those papers to me, and I reviewed what I had done for my uncle. * * *

"We talked about a will. * * * That I didn't find the will, but that I intended to establish a will, but to avoid that if she wanted to assign her share over to me, that I wouldn't go through estab-

lishing a will, which was my first intention, until it was suggested to me by the public administrator and the attorney out there that the assignments would be a simpler way of doing it.   *   *   * There wasn't any discussion about the funeral expenses I just assumed those.   *   *   *

"I told her too that as far as I could see my uncle didn't have very much.   *   *   *   I also told her that I couldn't find out how much money he had and I didn't know whether he had a penny or a million dollars, and I don't know that now.   *   *   * I told them that he had agreed to leave me his property when I was there if I would take care of him and live with him, and that he had agreed to send my daughter through college, and I was to give up teaching and live with him, either there or in Michigan.   *   *   *

"I didn't know the amount of property in my uncle's estate from my investigation.   *   *   *   I haven't formed any definite opinion whether there is anything more than enough to pay the bill that I presented.   *   *   *

"*Q.*   *   *   * You yourself firmly believed at that time that there wasn't enough to pay the funeral bill?   *   *   *

"*A.* From what I saw, there wasn't enough. *   *   *

"If there is anything over and above the expenses coming to my aunts I want it, because my uncle wanted me to have it.   *   *   * I had never been given any information at all as to the value of my uncle's estate.   *   *   *

"I claim I made a contract with my uncle that if I came and lived in my uncle's home, he would deed his property to me or will it to me. I didn't go live in his home. I never got around to do it. *   *   * The night (April 2, 1945) Mr. Goodrich and Mr. Ickes and their wives called on me at Lawton they told me they had a list of assets. *   *   *

"He (Goodrich) waved something in the air and said there was something about $20,000. * * * I told him, whether it was great or small, whether it was $20,000 or less, I owned the two-thirds interest, one-third of Goodrich and one-third Ickes, and I intended to keep it. * * * Neither of my aunts knew the nature and extent of what they were signing away. They didn't know, nor I didn't know. * * *

"I had given my uncle $2,000 at the time I was there to invest for me. * * *

"When I asked these aunts to make the assignments I believed that I had a good case to establish a will."

It appears that on March 6, 1945, the public administrator filed a semiannual account in the Halstead estate, which indicated that the approximate net value of the estate was $2,514.48. Later in March he sent a copy of an inventory to plaintiffs' attorneys, but his accompanying letter stated that the property in the estate had not been appraised. This inventory, which appears in the record, indicates that there were mortgages, cash, and other assets in the estate amounting to about $15,000. When plaintiffs were advised of the property shown by this inventory, they immediately sought to repudiate their assignments on the ground that defendant had obtained them through fraud and misrepresentation as to the value of the property in the estate. In his opinion the trial court said:

"We may not reasonably fail to conclude on this record that defendant, with the benefit of all the information she obtained during her 2½ weeks in California, intentionally misrepresented the value of the estate to plaintiffs, who as we know then had no information whatever. But for the sake of the argument, let us suppose that she did not intentionally misrepresent its value, still she may not be

permitted to enrich herself unjustly by the acquisition of such valuable rights of plaintiffs as her own. She may not be heard to say that she did not intend to defraud them, but having perpetrated a legal or constructive fraud she will retain the benefit thereof. The loss to the plaintiffs and the gain to the defendant is the same whether the fraud is intentional or not.''

It is clear that plaintiffs were induced to execute the assignments in question by defendant's statements and representations regarding the small amount of property in the Halstead estate and her representation that she wanted the assignments for the purpose of obtaining reimbursement for funeral and other expenses which she had paid. However, we cannot agree with the trial court's finding that she ''intentionally misrepresented'' the value of the estate to plaintiffs. At the time she talked to them and obtained the assignments in December, 1944, defendant did not have any definite information which would reasonably have led her to believe that there was property in the estate materially in excess of the amount of her claim. Although her representations to plaintiffs regarding the amount of the estate were probably false, yet the record is quite convincing that she believed her statements to be true and that she did not know of their falsity at that time. The law is established in this State that false and fraudulent representations are actionable, although made innocently and in good faith, where the representations are relied upon and result in loss to the other party and in benefit to the person making them. This rule was stated in *Holcomb* v. *Noble,* 69 Mich. 396, 399, as follows:'

''An equally careful examination of the cases adjudicated in this State satisfies me that the doctrine is settled here, by a long line of cases, that if

there was in fact a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, he would have a right of action for the damages caused thereby either at law or in equity."

In the case of *Kolinski* v. *Solomon,* 303 Mich. 710, 714, we quoted with approval from *Rosenberg* v. *Cyrowski,* 227 Mich. 508, 511, as follows:

"When action is brought to recover for false and fraudulent representations made by one party to another in a transaction between them, any representations which are false in fact and actually deceive the other and are relied on by him to his damage are actionable, irrespective of whether the person making them knew them to be false or acted in good faith in making them, when the loss of the party deceived inured to the benefit of the other."

See, also, *Boss* v. *Tomaras,* 241 Mich. 540; *Bucannan* v. *Raymond,* 224 Mich. 462; *Mulheron* v. *Henry S. Koppin Co.,* 221 Mich. 187; *Hubbard* v. *Oliver,* 173 Mich. 337; *Aldrich* v. *Scribner,* 154 Mich. 23 (18 L. R. A. [N. S.] 379); *Totten* v. *Burhans,* 91 Mich. 495; *Busch* v. *Wilcox,* 82 Mich. 315.

In the present case defendant's representations, although undoubtedly made in good faith, induced plaintiffs to execute the assignments in question. If the assignments were held valid, this would result in a loss to plaintiffs and in an unmerited benefit to defendant. In the case of *Union Guardian Trust Co.* v. *Emery, supra,* we defined constructive fraud as follows (p. 404):

"Constructive fraud has been defined as a term applied to a great variety of transactions which equity regards as wrongful, to which it attaches the same or similar effects as those which follow from actual fraud, and for which it gives the same

or similar relief as that granted in cases of actual fraud. * * * *Constructive fraud has been evolved to designate what is, in its essence, nothing more than receipt and retention of unmerited benefits.''*

See, also, *Olitkowski* v. *St. Casimir's Savings & Loan Assn.,* 302 Mich. 303.

Defendant contends that she is entitled to the one-third interest of each of the plaintiffs in the uncle's estate, regardless of the amount of the estate. To hold with her contention that the assignments in question are valid would result in her receiving and retaining the unmerited benefits of a windfall which she did not expect when they were executed. Furthermore, there was no valid consideration for the assignments. No money was paid to plaintiffs, and the record is convincing that they executed the assignments as an accommodation to defendant and in the belief that their interests in the Halstead estate were of little, if any, value. Defendant argues that her forbearance from bringing suit to establish a will which she believed her uncle had executed, but which could not be found, constituted a sufficient consideration. This argument is without merit, as there was no controversy with plaintiffs over an alleged lost will, and the assignments were not executed in pursuance of any agreement of forbearance on defendant's part. In other words, plaintiffs gained no benefit and defendant suffered no detriment from her claimed forbearance from suit. Defendant further argues that the care and attention which she had given her aged grandmother (who was the mother of plaintiffs and of Grover Halstead) equitably entitled her to the uncle's estate, which she claims he had promised to will to her. This argument has no bearing on the question of a consideration for plaintiffs' assignments.

While the settlement of family disputes should be encouraged, nevertheless, a valid consideration must be shown for an assignment of an inheritable interest in an estate. There was no consideration for the assignments in question from plaintiffs to defendant.

From our *de novo* review of the record we are convinced that the facts and circumstances shown justified a court of equity in intervening and setting aside the assignments in order to prevent an unconscionable wrong. Although the evidence does not establish moral culpability on defendant's part, we conclude that there was ample proof of a constructive or legal fraud upon plaintiffs and that to hold the assignments valid would result in defendant's receipt of unmerited benefits and in her unjust enrichment. *Olitkowski* v. *St. Casimir's Savings & Loan Assn., supra; Union Guardian Trust Co.* v. *Emery, supra.*

The trial court saw and heard the parties and their respective witnesses and was in a better position to judge their credibility and the weight to be accorded their testimony. We are not disposed to interfere with the court's decree, which set aside the assignments. Other questions presented do not require consideration.

It should be noted that this opinion determines only the question of the validity of the assignments from plaintiffs to defendant and is without prejudice to defendant's right to assert such claims, if any, as she may have against the Halstead estate. The decree of the trial court is affirmed. Plaintiffs may recover costs of both courts.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred.