GENERAL ELECTRIC CREDIT CORPORATION v WOLVERINE
INSURANCE COMPANY

Docket No. 70435. Argued May 10, 1984 (Calendar No. 12).—Decided
December 28, 1984. Released January 9, 1985.

General Electric Credit Corporation brought an action in the
Wayne Circuit Court against Number One Mobile Homes, Inc.,
Robert E. Sivyer, and Marlene J. Sivyer, operators of Number
One, and Wolverine Insurance Company, surety for Number
One, seeking damages for fraudulent and wrongful conversion
of the proceeds of the sale of certain mobile homes in which
G. E. retained a security interest under a floor plan financing
agreement. The court, Charles Kaufman, J., granted G. E.'s
motion for summary judgment, rejecting Wolverine's claim that
actual or intentional fraud on the part of Number One and the
Sivyers and not merely constructive fraud was required to find
liability, that the aggregate liability of Wolverine was limited
to the amount of its bond for one year, notwithstanding that
the acts in question occurred in two separate years and that
the bond had been renewed for the second year, and that
prejudgment interest and costs were not taxable. The Court of
Appeals, Cynar, P.J., and Bronson and Ernst, JJ., affirmed
(Docket No. 54213). Wolverine appeals.

In an opinion by Justice Ryan, joined by Chief Justice Wil-
liams and Justices Kavanagh, Brickley, Cavanagh, and Boyle,
the Supreme Court held:

A surety bond issued in behalf of a licensed mobile home
dealer indemnifies against fraud by the dealer, both actual and
constructive. The aggregate potential liability of the surety is
the total of the annual limits of liability for each year that
protection is provided. Prejudgment interest and costs in an
action involving dealer fraud may be recovered even where it

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 41 Am Jur 2d, Indemnity §§ 4, 6, 31.
  54 Am Jur 2d, Mobile Homes, Trailer Parks, and Tourist Camps
    § 18.
  74 Am Jur 2d, Suretyship § 24 et seq.
[2, 3] 41 Am Jur 2d, Indemnity § 35.
[3] 41 Am Jur 2d, Indemnity § 36.

causes the total amount of the recovery to be in excess of the aggregate annual limit.

1. To become a licensed mobile home dealer under the Michigan Vehicle Code, a dealer must obtain a bond in the amount of $10,000 to protect the general public against loss caused by fraudulent conduct by the dealer. The scope of the word "fraud" as used in the code as well as the natural, common, and ordinarily understood meaning of the word, and its definition in case law, includes actual and constructive fraud. The fact that actual fraud and constructive fraud have separate elements and may require different proofs does not suggest that the protection of the code extends only to actual fraud. Use of a generic word such as fraud was intended to include all types of fraud. Use of the term in surety bonds issued in compliance with the code must be interpreted in the light of the meaning intended under the code.

2. The surety bond procured to obtain a license must provide $10,000 worth of protection for the year in which it is issued. The dealer must provide continuous protection either through renewal of the bond or by acquiring substitute protection. Thus, if renewed, the bond provides protection during the renewal year. Liability for events happening in a single covered year cannot exceed the sum of the bond. Where, as in this case, fraud occurred in separate years in which the bond was in force, the limit on the surety's liability is $10,000 for each year and not $10,000 in the aggregate.

3. Where it is the legislative purpose to compensate a prevailing party for delay in payment of money damages and for costs incurred in litigation, it can be effectuated by allowing prejudgment interest and costs to be awarded even where the total amount of the award plus prejudgment interest and costs exceed the bond's annual limit.

Justice Levin concurred in the result only.

Affirmed.

120 Mich App 227; 327 NW2d 449 (1982) affirmed.

1. SURETYSHIP AND GUARANTEE — SURETY BONDS — MOBILE HOME
   DEALERS — FRAUD.

   A surety bond issued in behalf of a licensed mobile home dealer indemnifies against fraud by the dealer, both actual and constructive (MCL 257.248[7]; MSA 9.1948[7]).

2. SURETYSHIP AND GUARANTEE — SURETY BONDS — MOBILE HOME
   DEALERS — FRAUD — LIMIT OF LIABILITY.

   The aggregate potential limit of liability on a bond which is renewed from year to year of a surety of a mobile home dealer

resulting from dealer fraud is the total of the annual limits of liability for each year that protection is provided (MCL 257.248[7]; MSA 9.1948[7]).

3. SURETYSHIP AND GUARANTEE — SURETY BONDS — MOBILE HOME DEALERS — FRAUD — LIMIT OF LIABILITY.

In an action arising from the fraud of a mobile home dealer, prejudgment interest and costs may be awarded against the dealer's surety even where the total amount of the award exceeds the aggregate annual limit of the bonds provided by the surety (MCL 257.248[7]; MSA 9.1948[7]).

*Louis P. Labbe* for the plaintiff.

*Jenkins, Nystrom, Hitchcock & Nystrom* (by *Jeannette A. Paskin)* for Wolverine Insurance Company.

RYAN, J. This case is concerned with the meaning of the word "fraud" as used in a surety bond whose terms are prescribed by statute. Three questions are presented:

1. Whether the term "fraud" in the expression "fraud, cheating, or misrepresentation," as used in a surety bond issued pursuant to MCL 257.248(7); MSA 9.1948(7),[1] means only actual fraud or also means constructive fraud;

2. Whether MCL 257.248(7); MSA 9.1948(7) limits the liability of a surety to a total of $10,000 where a $10,000 surety bond is issued in one year, and renewed the following year, and wrongful acts occur in each year resulting in defalcations exceeding $10,000 in each year; and

3. Whether the trial court erred in assessing prejudgment interest against the defendant surety.

I.

Number One Mobile Homes, Inc. (hereafter

_____
[1] Formerly MCL 257.248(g); MSA 9.1948(g).

NOMH) is a licensed mobile home dealer operated by individual defendants Robert and Marlene Sivyer. As a condition of becoming a licensed mobile home dealer, NOMH was required to meet several requirements. One of these, contained in MCL 257.248(7); MSA 9.1948(7), requires that a licensed mobile home dealer obtain a "properly executed bond or renewal certificate." MCL 257.248(7); MSA 9.1948(7) provides:

"An applicant for a new vehicle dealer or a used or secondhand vehicle dealer or broker license shall accompany the application with a properly executed bond or renewal certificate. *If a renewal certificate is used, the bond shall be considered as renewed for each succeeding year in the same amount and with the same effect as an original bond.* The bond shall be in the sum of $10,000.00 with good and sufficient surety to be approved by the secretary of state. The bond shall be conditioned to indemnify or reimburse a purchaser, seller, financing agency, or governmental agency for monetary loss caused through fraud, cheating, or misrepresentation in the conduct of the vehicle business, whether the fraud, cheating, or misrepresentation was made by the dealer or by an employee, agent, or salesperson of the dealer. The surety shall be required to make indemnification or reimbursement for a monetary loss only after judgment based on *fraud, cheating, or misrepresentation* has been entered in a court of record against the licensee. The bond shall also be conditioned to indemnify or reimburse the state for any sales tax deficiency as provided in Act No. 167 of the Public Acts of 1933, as amended, being sections 205.51 to 205.78 of the Michigan Compiled Laws, or use tax deficiency as provided in Act No. 94 of the Public Acts of 1937, as amended, being sections 205.91 to 205.111 of the Michigan Compiled Laws, for the year in which the bond was in force. The surety shall be required to make indemnification or reimbursement only after final judgment has been entered in a court of record against the licensee. A dealer or applicant who has furnished satisfactory proof that a bond similar to the bond required by this subsec-

tion is executed and in force shall be exempt from the bond provisions set forth in this subsection. The aggregate liability of the surety shall not exceed the sum of the bond. The surety on the bond may cancel the bond upon giving 30 days' notice in writing to the secretary of state and thereafter shall not be liable for a breach of condition occurring after the effective date of the cancellation." (Emphasis added.)

NOMH procured a conforming surety bond from Wolverine Insurance Company for calendar year 1977. The bond was "renewed" for 1978 and Wolverine issued a renewal certificate. The bond contained the following language:

"Now therefore, the condition of this obligation is such that the principal and surety shall indemnify or reimburse any purchaser, seller, financing agency or governmental agency for any monetary loss only after judgment based on *fraud, cheating or misrepresentation* has been entered in a court record *[sic]* against the licensee.

\* \* \*

"Provided further, that the aggregate liability of the surety for all such judgments shall, in no event, exceed the sum of this bond.

"Coverage hereunder shall be effective as of 12:01 a.m. on January 1, 1977 and shall remain in effect continuously, provided, however, that the said surety may cancel the bond upon giving thirty days notice in writing to the Secretary of State and thereafter shall be relieved of liability for any breach of condition occurring after the effective date of the cancellation." (Emphasis added.)

In November 1976, NOMH entered into a floor plan financing arrangement with the plaintiff, General Electric Credit Corporation (hereafter GECC). The agreement provided that GECC would loan money to NOMH to buy mobile home units for sale at retail, but would retain a security

interest in all of NOMH's inventory and equipment. When a unit of secured property was sold, NOMH was required to repay to GECC the amount owed on that item or place all money received on the sale into a trust account for the benefit of GECC until such payment was made. In late 1977 and again in early 1978, NOMH violated this agreement by selling mobile homes subject to the security agreement without either paying its indebtedness on those items or placing the money received into the trust account for GECC.

On May 29, 1979, GECC filed suit against the defendants. The essential allegations of the plaintiff's claims are pleaded in four counts, but only the third and fourth counts are relevant to our inquiry. In Count III, claiming against all of the defendants except Wolverine, GECC alleges that NOMH and the individual defendants sold four mobile homes "out of trust," by which is meant that NOMH neither paid GECC for the units sold nor placed an amount equal to the funds derived from the sale into a trust account. Specifically, GECC claims that in December 1977 NOMH and the individual defendants sold two mobile homes which were subject to the security agreement without remitting to GECC an amount equal to the indebtedness on the units or paying the money into the trust account, that they sold a mobile home in January 1978 which was subject to the security agreement without paying the indebtedness or remitting the funds received to the trust account, and that in March 1978 they sold still another mobile home which was subject to the security agreement without paying the indebtedness or remitting the funds received to the trust account. GECC claimed entitlement to a judgment against the individual defendants for damages of $26,086.01 "for fraudulent and wrongful conver-

sion through fraud, cheating or misrepresentation". In Count IV, GECC claimed that as financing agent for NOMH, and pursuant to the terms of the surety bond issued by Wolverine, it was entitled to payment from Wolverine for damages based upon the fraud identified in Count III and prayed for entry of a judgment for $26,086.01 plus 6% interest per annum from date of the judgment together with attorney fees and costs.

The trial court granted summary judgment in favor of GECC on Counts III and IV of its complaint.

The summary judgment against NOMH and the individual defendants under Count III of the complaint is stated, in part, to be "on account of fraudulent and wrongful conversion fraud, cheating or misrepresentation; in 1977 in the sum of $15,179.97; and in 1978 in the sum of $10,906.14; for a total of $26,086.81; plus prejudgment interest from May 26, 1978 to September 26, 1980 at 6% per annum." Under Count IV, the trial court awarded summary judgment for $20,000 plus costs against Wolverine "under its statutory liability and the judgment entered in favor of plaintiff against [NOMH] and [the individual defendants]." It is clear, therefore, and indeed not controverted, that the judgment against Wolverine was based on the judgment against the individual defendants for "fraud, cheating, or misrepresentation" as provided in the statute earlier quoted.

In awarding the summary judgments, the trial court rejected the three claims or defenses that had been asserted by Wolverine:

—That "fraud," as that term is used in the statute, MCL 257.248(7); MSA 9.1948(7), and the surety bond, required proof of actual or intentional fraud and not merely constructive fraud;

—That the surety's total aggregate liability for

the losses in both years could not exceed $10,000; and

—That prejudgment interest and costs were not taxable.

On appeal, the Court of Appeals affirmed. 120 Mich App 227; 327 NW2d 449 (1982). It found that "fraud" is a broad generic term generally encompassing both actual and constructive fraud, that a broad reading of the term "fraud" was consistent with the legislative policy behind the statute, and that fidelity bonds are generally given the construction which is favorable to the insured in cases where the policy language is susceptible to more than one interpretation. The Court also concluded that the renewal of the bond in 1978 constituted a separate bond agreement which afforded $10,000 protection for 1978 in addition to, or separate from, the original $10,000 protection for 1977. The Court of Appeals did not discuss Wolverine's contention that the trial court erred in granting prejudgment interest.

We granted leave to appeal. 418 Mich 879 (1983).

II

Wolverine's broadest argument is that no liability arose under the surety bond policy because the surety bond and MCL 257.248(7); MSA 9.1948(7) provide for the imposition of liability only upon entry of a judgment for "fraud, cheating, or misrepresentation," and that "fraud," as used in the statute and the surety bond, means only actual fraud and does not include constructive fraud.[2] Therefore, Wolverine argues, since the judgment entered against NOMH was based only upon a

---

[2] It is clear from an examination of the pleadings that the plaintiff alleged and proceeded to judgment on a theory of constructive fraud and that that fact is not contested by the parties.

finding of constructive fraud under Count III, there is no liability under the bond in this case. In support of its theory, Wolverine argues that judgments for actual fraud and constructive fraud require different proofs, that they do not have the same elements, and that they are not the same tort. According to Wolverine, if the Legislature had intended to include both types of fraud within the scope of the statute, it could have easily done so by specifically stating that "fraud" includes both actual fraud and constructive fraud, and, since it did not do so, one must assume that it intended only to guard against actual fraud. Moreover, according to Wolverine, the words "cheating" and "misrepresentation" include only acts which are intentional. Consequently, in linking "fraud" to those terms, the Legislature indicated an intention that "fraud" does not include constructive fraud which is not intentional fraud. Wolverine cites the analogous situation of fidelity and bankers blanket bonds which, it is claimed, require proof of actual fraud for liability to arise for "fraud":

"In order to constitute fraud or dishonesty, some courts have held that it is necessary that the employee have the intent to deceive or to cheat the employer or at least to benefit himself or a third party to the detriment of the employer's interests. Consequently, mere irregularities committed without such intent do not constitute acts of fraud or dishonesty." 13 Couch, Insurance, 2d, § 46:55, p 58.

"A bond indemnifying a company against loss from the fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction of its treasurer does not cover acts innocently done which are merely constructively or technically a fraud or fraudulent . . . ." 13 Couch, Insurance, 2d, § 46:42, p 47.

Finally, Wolverine argues, surety bonds are con-

tracts whose liability must be strictly limited to their terms. *Swartz v Laurencelle,* 371 Mich 153; 123 NW2d 244 (1963); *Comm'r of Banking v Chelsea Savings Bank,* 161 Mich 691; 125 NW 424; 127 NW 351 (1910).

We cannot agree with Wolverine's analysis or its conclusion.

First, while Wolverine may be correct in saying that, as a general proposition, "the rules * * * of construction [of surety contracts] are not different from those employed in the interpretation and construction of other written agreements," *Chelsea Savings Bank, supra,* p 699, that general rule does not adequately describe the standard for interpretation of a surety bond whose terms are mandated by statute. The terms of a statutorily required surety bond are interpreted in light of the meaning of the language of the statute and the apparent intent of the Legislature. *Comm'r of Ins v Central West Casualty Co,* 301 Mich 427; 3 NW2d 830 (1942). More particularly, when the language of the surety bond uses the precise language of the statute, that language is interpreted to carry the Legislature's meaning. *Brockway v Petted,* 79 Mich 620; 45 NW 61 (1890); *Lawrence v American Surety Co of New York,* 263 Mich 586; 249 NW 3 (1933). Therefore, in interpreting the word "fraud," as used in the statute and in the bond drawn in conformance with the statute, we must consider the legislative intent and not merely construe the scope of the surety bond strictly in favor of the insurer, as Wolverine suggests.

The fact that actions for actual fraud and constructive fraud have separate elements and may require different proofs does not mean that both concepts are not included within the term "fraud." Use of the noun "fraud," unadorned by attachment of the descriptive modifiers "actual" or "con-

structive," does not suggest that the intended meaning is actual fraud rather than constructive fraud. Instead, as will be discussed more fully below, the use of a generic word like "fraud" suggests an intention that all genres of that word are included within its scope. Moreover, the fact that the Legislature might have specifically delineated constructive fraud as being included within the scope of the word "fraud" and did not do so is not persuasive evidence that constructive fraud is not included in the word "fraud" since the Legislature could just as easily have specifically limited "fraud" to actual fraud by the insertion of a single word if that had been its intention. Therefore, the fact that actual and constructive fraud have different elements of proof and the Legislature could have provided a more specific definition of each if it had intended that the two not be included within the term fraud in MCL 257.248(7); MSA 9.1948(7) does not answer the question whether the two are included within the term fraud; rather, it begs it.

Wolverine argues that the phrase "fraud, cheating, or misrepresentation," as used in the statute and the bond in question, means only intentional misconduct. We do not agree. A review of the law of misrepresentation indicates that a misrepresentation is "an assertion which is not in accord with the facts." Restatement Contracts, 2d, § 159, p 426. The definition does not distinguish between incorrect statements that are intentional, or negligent, or even innocent. Additionally, 3 Restatement Torts, 2d, §§ 525 and 552, indicates that there are "fraudulent misrepresentations," "negligent misrepresentations," and "innocent misrepresentations." Wolverine's argument that the expression "fraud, cheating, and misrepresentation" involves only intentional misconduct and that "fraud" is

therefore also limited to intentional conduct, is clearly incorrect.

Finally, as with Wolverine's strict interpretation argument, its "analogous" fidelity-and-bankers-blanket-bonds argument fails to consider the fact that the statutory word "fraud" must be interpreted in the light of the legislative intent, and is not simply defined by a general rule of interpretation applicable to surety bonds where issuance and operative language are not mandated by statute.

We think the Legislature meant to include both actual and constructive fraud within the scope of the word "fraud" when it required surety bonds for "fraud, cheating, or misrepresentation" in MCL 257.248(7); MSA 9.1948(7). We reach this conclusion upon the basis of the following analysis:

First, the word "fraud" must be interpreted in the light of the legislative intent behind MCL 257.248(7); MSA 9.1948(7). *Brockway, supra; Lawrence, supra.* From the terms of the statute it is plain that the Legislature, in enacting MCL 257.248(7); MSA 9.1948(7), intended to protect the general public by requiring a license and a bond for persons dealing in motor vehicles. As MCL 257.248(7); MSA 9.1948(7) states, protection is to extend to a "purchaser, seller, financing agency, or governmental agency." Essentially, anyone who might suffer financial loss in the course of a transaction with a motor vehicle dealer is protected. Since the Legislature intended the statute to afford protection to the public, the language of surety bonds issued in compliance with the statute must be interpreted in the light of that purpose. As this Court said in *Detroit v Blue Ribbon Auto Drivers' Ass'n,* 254 Mich 263, 267; 237 NW 61 (1931):

"This bond was obviously required for the protection

of the public. If its purpose had been to protect rights of the municipality issuing the license, there would be force and logic in limiting the life of the bond to the license period. * * * But when, as here, the bond is given to afford protection to the general public, if its terms permit, it should be so construed as to accomplish that purpose."

If statutory terms included in a surety bond are interpreted to afford protection to the general public and not narrowly construed to limit the insurer's liability at the expense of the general public, an interpretation consistent with such a purpose necessarily contemplates protection against both actual and constructive fraud.

Even without such a rule of construction, however, the word "fraud" in MCL 257.248(7); MSA 9.1948(7) must be given its natural, common, ordinary, and primarily understood meaning, and not unjustifiably restricted and narrowly or technically limited. The natural, common, and ordinarily understood definition of the word "fraud" embraces both actual and constructive fraud. This is clear even from a reading of the general dictionary definitions of the word. Webster's, for example, defines "fraud" to include both the "intentional perversion of truth in order to induce another to part with something of value" and "an act of deceiving or misrepresenting." *Webster's New Collegiate Dictionary,* 1975 ed, p 457. "Intentional perversion of the truth" is actual fraud based upon an intent to defraud while "an act of deceiving or misrepresenting" may be constructive fraud which only requires a misrepresentation which need not amount to a purposeful design to defraud.

Black's Law Dictionary also indicates that the term "fraud" includes both actual and constructive fraud when it states that "fraud is either *actual* or *constructive.*" (Emphasis in original.) Black's Law

Dictionary, 5th ed, p 595. In turn, Black's defines actual fraud as the intentional use of deception for one's advantage while constructive fraud "may have been unconnected with any selfish or evil design." *Id.* The familiar encyclopedic legal authorities describe the term "fraud" as a "generic" concept which includes "many different degrees" and, in

"its general or generic sense, it comprises all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another, or the taking of undue or unconscientious advantage of another . . . ." 37 CJS, Fraud, § 1, p 204. See also 37 Am Jur 2d, Fraud and Deceit, § 1, p 17.

Finally, this Court has long implicitly recognized that the word "fraud" includes both actual and constructive fraud. In *Goodrich v Waller,* 314 Mich 456, 461; 22 NW2d 862 (1946), the Court said:

"The important question in the present case is whether or not plaintiffs established actual fraud or constructive fraud entitling them to cancellation of their respective assignments to defendant. *Fraud* will not be presumed, cannot be lightly inferred, but must be established by a preponderance of evidence." (Emphasis added.)

The *Goodrich* Court, therefore, used the word fraud as embracing both actual fraud and constructive fraud, even though it defined them separately.

The Legislature is presumed to know the primary, ordinary, and generally understood meaning of the words it uses and uses them consistent with that meaning unless a contrary intention is manifested. *People ex rel Hughes v May,* 3 Mich 598 (1855); *People v Labbe,* 202 Mich 513; 168 NW 451

(1918); *Advisory Opinion on Constitutionality of 1978 PA 426,* 403 Mich 631; 272 NW2d 495 (1978). Therefore, the word "fraud" in MCL 257.248(7); MSA 9.1948(7) should be given its common and ordinarily understood meaning, which includes both actual and constructive fraud, there being no contrary indication that the Legislature intended the word to have a different meaning.

In summary, since the commonly understood meaning of the word fraud is consistent with the legislative intent behind MCL 257.248(7); MSA 9.1948(7) to protect the general public and third parties, the term fraud as used in MCL 257.248(7); MSA 9.1948(7) includes both actual and constructive fraud.

### III

Wolverine also contends that, even if liability under the surety bond is triggered by a constructive fraud judgment against NOMH and the individual defendants, that liability is limited to a total of $10,000, notwithstanding the fact that the bond was renewed for a second year and was required by MCL 257.248(7); MSA 9.1948(7) to be "in the same amount and with the same effect as an original bond." In support of its claim, Wolverine argues that the surety bond was a "continuous" bond since the bond states that coverage "shall remain in effect continuously."

The original surety bond issued by Wolverine stated that "the aggregate liability of the surety for all such judgments shall, in no event, exceed the sum of this bond." This language is taken from MCL 257.248(7); MSA 9.1948(7) which states that the "aggregate liability of the surety shall not exceed the sum of the bond." Therefore, Wolverine argues, since the bond language and MCL

257.248(7); MSA 9.1948(7) indicate that the surety bond is "continuous" rather than "aggregate," liability under the bond is limited to $10,000 without regard to how often the bond is renewed, when the surety violations occur, or how many years pass or premiums are paid.

We do not agree.

We are satisfied that the correct interpretation of the language of the bond and of the statute which requires it is that the surety bond provided $10,000 coverage for its first year, covering events occurring in that year, and that the subsequent "renewal" of the surety bond provided another $10,000 coverage for the second year for events occurring in that year.

As we have said, the bond in this case is required by statute, and its terms are interpreted in the light of the statute which requires it. In *Central West Casualty Co, supra,* quoting *Lawrence v American Surety Co of New York, supra,* 263 Mich 597-598, this Court said:

" 'It is the general rule that existing law becomes part of a statutory bond, *i.e.,* one commanded or provided by statute, so that omitted conditions required by the law are read into the bond, and conditions not so required, which limit or restrict liability, are read out of it as surplusage. The rule governs not only the bonds of public officials but others.' "

Therefore, the scope of the surety bond's coverage is determined according to the statutory requirements. In this case, MCL 257.248(7); MSA 9.1948(7) specifically states that the renewal bond shall be "in the same amount and with the same effect as an *original* bond" (emphasis added). Plainly implicit is the notion that multiple bonds are required—an original bond and another bond having the "same effect," for the following year. The

*original* bond provided $10,000 protection, lasted one year, and covered judgments for "fraud, cheating, or misrepresentation." If the statutory statement that the renewal bond was to be "in the same amount and with the same effect as an original bond" is to have any meaning, a "renewed" surety bond must afford $10,000 protection for "fraud, cheating, or misrepresentation" judgments based upon acts occurring during the renewal year. Consequently, while the statute mandates that coverage "shall remain in effect continuously," the renewed surety bond is required to provide additional, renewed, and aggregate coverage.

Moreover, we find no indication that the Legislature or Wolverine intended the statutory surety bonds to be merely "continuous" as the surety construes that term. Wolverine argues that the bond originally issued is "continuous" and affords only $10,000 coverage regardless of the number of years covered, the number of renewals issued, the number of annual premiums paid, and the number and amount of covered defalcations. The first basis for this argument is that the policy states that the coverage was to "remain in effect continuously." But that language does not create a "continuous" bond. Instead, that phrase is related to the duration of coverage, its commencement and the termination, and not to the scope or terms of coverage. The relevant language of the surety bond, in context, states: "Coverage hereunder shall be effective as of 12:01 a.m. on January 1, 1977 and shall remain in effect continuously, provided, however, that the said surety may cancel the bond." Therefore, the word "continuously" in the surety bond policy does not indicate a limitation on renewed coverage.

Wolverine's second basis for asserting that the

coverage of the surety bond should not be "aggregated" is that the bond states that the aggregate liability of the surety for all such judgments shall, in no event, exceed the sum of the bond." However, as with the "continuous" argument, the bond language must be read in context. In MCL 257.248(7); MSA 9.1948(7), the Legislature requires a one-year bond to run the same length of time as the motor vehicle dealer's license. The terms of that one-year bond are that it provides $10,000 coverage of certain listed judgments. The following year, when the motor vehicle dealer's license is to be renewed, if a new bond is not obtained, for example, from a new underwriter, the previous bond must be renewed and must again afford the same protection as provided by the first one-year bond.

The statutory provision that the "aggregate liability of the surety shall not exceed the sum of the bond" refers to the separate years of coverage and means that the surety is not liable for multiple judgments for "fraud, cheating, or misrepresentation" occurring *in a single year* that result in a total or aggregate liability *for that year* of more than $10,000, the annual limit on liability. This interpretation is further supported by the position of the "aggregate liability" clause within MCL 257.248(7); MSA 9.1948(7) quoted above. The clause does not follow the statement concerning the amount of bond required, or the statement of the persons covered, or even the actions to be indemnified against. Instead, it follows upon a statement concerning the fact that a motor vehicle dealer may acquire substitute protection similar to the protection required. In other words, the language of the statute makes it clear that, whether a statutory bond or similar bond is used, the liability

for events happening in a single covered year shall not exceed the sum of the bond.

Interpreting a surety bond to be "continuous," in the way Wolverine would have us do in this case, would be to hold that the insured was paying an additional premium while receiving no additional protection.

As Justice FELLOWS observed in his dissenting opinion in *Michigan Mortgage-Investment Corp v American Employers' Ins Co of Boston,* 244 Mich 72, 75-76; 221 NW 140 (1928):

"[I]f there are two contracts each agreeing to indemnify for loss during the period covered by it up to a certain sum, and a loss occurs during both periods, I see no impediment in a recovery on both contracts up to the limit fixed in each. If this is not the rule, then plaintiff received no consideration for the premiums paid on the second or renewal policy, and the only way employers may be protected by this character of insurance will be to take a new policy in a different company each year. If there had been two original policies issued by defendant to plaintiff covering different periods, each containing the language limiting recovery quoted by my Brother, I do not think we would hesitate in holding that such limitation was a limitation on the amount recoverable under each of the policies for loss during the period covered. I do not believe we would extend the limiting languages to losses arising under the other policy."[3]

The Legislature sought, by the statute here in question, to protect third parties, not to penalize motor vehicle dealers by requiring the purchase of near valueless bonds.

The legislative purpose in requiring a yearly

---

[3] Since *Michigan Mortgage-Investment Corp* did not involve a statutorily mandated bond, we need not evaluate the soundness of its reasoning. In the light of the legislative intent underlying MCL 257.248(7); MSA 9.1948(7), however, it is clear that the observations of dissenting Justice FELLOWS are accurately applicable to this case.

bond is to provide protection to the general public. An interpretation of the statute which provides only limited or static protection would defeat the legislative purpose in enacting the statute.

We hold that the original surety bond in this case provided $10,000 protection for the year for which it was issued and that the renewed bond provided $10,000 protection for the year for which the renewal certificate was issued. Consequently, we reject Wolverine's claim that it was liable for only $10,000, since the defalcations, adjudicated in the circuit court to have been based on "fraud, cheating or misrepresentation," occurred in successive years, and separate bond coverage had been obtained for each year.

## IV

Wolverine's final contention, stated in a single paragraph in its brief, is that the trial court improperly assessed prejudgment interest "on an amount exceeding its portion of the judgment" and that, if prejudgment interest is appropriate, "it should not be paid on more than the statutory amount of the bond." The Court of Appeals did not discuss this issue.

In support of its argument, Wolverine cites *Denham v Bedford,* 407 Mich 517; 287 NW2d 168 (1980). However, *Denham* does not stand for the proposition that prejudgment interest cannot be assessed if it causes the total liability to exeed the policy limits. Instead, *Denham* stands for the proposition that prejudgment interest is properly awarded even if the insurer's total liability then exceeds the policy's stated limits. As the Court said:

"If the legislative purpose was to compensate the

prevailing party for the delay in payment of money damages and to cover the costs of litigation, then this legislative purpose can only be effectuated by the allowance of prejudgment interest, even if this interest exceeds the policy limits of an insurance contract." *Denham,* pp 534-535.

Wolverine is not entitled to any relief on this point.

V

The word "fraud," as used in MCL 257.248(7); MSA 9.1948(7), encompasses both actual fraud and constructive fraud. Since there was a judgment in this case for constructive fraud, liability under the surety bond attaches. The amount of that liability is $10,000 for the year covered by the original bond and $10,000 for the year covered by the renewal certificate because MCL 257.248(7); MSA 9.1948(7) requires a bond "in the same amount and with the same effect as an original bond" for each year in which a license is held. The trial court properly granted prejudgment interest in this case.

The judgment of the Court of Appeals is affirmed.

WILLIAMS, C. J., and KAVANAGH, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred with RYAN, J.

LEVIN, J., concurred in the result only.