No. 87-463

IN THE SUPREME COURT OF THE STATE OF MONTANA
1988

STATE OF MONTANA, acting by and through
the DEPARTMENT OF AGRICULTURE,

        Plaintiff and Respondent,

-vs-

A.B.N. RANCH, et al.,

        Defendant and Appellant.


APPEAL FROM:    The District Court of the First Judicial District,
                In and for the County of Lewis & Clark,
                The Honorable Thomas Honzel, Judge presiding.

COUNSEL OF RECORD:
        For Appellant:

                Lilly, Andriolo & Schraudner; Michael J. Lilly,
                Bozeman, Montana

        For Respondents:

                Timothy J. Meloy, Dept. of Agriculture, Helena,
                Montana
                Rae V. Kalbfleisch, Shelby, Montana
                Hugh Brown, Chester, Montana
                Thomas Budewitz, Townsend, Montana
                Kenneth Frazier, Billings, Montana
                Donald Hamilton, Great Falls, Montana
                R. W. Heineman, Wibaux, Montana
                Steve Johnson, Great Falls, Montana
                Dale Keil, Conrad, Montana
                Keith Maristuen, Havre, Montana
                Joseph Mudd, Bridger, Montana
                L.D. Nybo, Great Falls, Montana
                Rodney Peterson, Cut Bank, Montana


                                Submitted on Briefs: Jan. 14, 1988
                                    Decided: FEB 2 9 1988

Filed: FEB 2 9 1988

                        _Ethel M. Harrison_
        _____
                        Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

This is an appeal of an order distributing bond proceeds made by the First Judicial District Court, Lewis and Clark County, Montana, in its memorandum and order of August 6, 1987. Originally, the State of Montana Department of Agriculture (State), filed an interpleader action after receiving bond proceeds from the surety of Coast Trading Company, Inc. (Coast) after Coast declared bankruptcy.

The District Court determined that there were two categories of numerous defendants entitled to receive the proceeds. One category is a group of independent grain dealers (Dealers) who contracted with Coast at its Portland, Oregon, office, through an agent located in Great Falls, Montana. The other category is comprised of a number of farmers (Farmers) who dealt directly with twelve grain elevators located throughout the state of Montana. The court determined that the Farmers were secured under a $195,000 grain dealer and public warehouseman bond and the Dealers were secured under a $20,000 grain merchandiser-track buyer bond. It is from this determination that the Dealers appeal.

We affirm.

The only issue we have before us is whether the District Court properly allocated the bond proceeds held by the State among the various defendants after granting summary judgment. Both parties agree that there is no material issue of fact and therefore this appeal is only to consider whether the District Court erred in adopting the distribution plan suggested by the State.

In 1980, the State determined Coast was conducting two separate and independent grain purchasing businesses. Coast

2

originally applied for two separate licenses in compliance with Montana law.

In July, 1981, Coast renewed its grain purchasing licenses for the 1981-1982 grain year and it was required to execute two bonds. One bond was entitled a grain merchandiser-track buyer bond in the amount of $20,000. The other was entitled a grain dealer-public warehouseman bond in the amount of $195,000.

The grain dealer-public warehouseman bond expressly stated that Coast operated twelve public local warehouses at Agawan, Bainville, Brady, Galata, Geraldine, Great Falls, Lothair, Missoula, Plains, Power, Square Butte, and Tiber, Montana. Farmers sold grain to these twelve elevators pursuant to contracts entered into with Kenneth Branvold, manager for the Montana and North Dakota elevators of Coast. Each elevator manager purchased grain from the Farmers under a grain purchase agreement. Generally, the Farmers would deliver the grain to one of the twelve grain elevators without any freight charge to Coast. Occasionally, Coast would send a tractor-trailer unit to the Farmers to pick up the grain. The local elevator manager would issue a grain sale ticket. If stored at the local elevator a warehouse receipt would be exchanged for the ticket.

Under the grain dealer-public warehouseman transaction, all grain purchased by the Coast elevators was paid for by the local elevator manager with a check drawn upon a Montana bank. Branvold stated in his deposition that he purchased grain out of the Great Falls office under the grain dealer-public warehouseman license and did not purchase grain for the Portland office. He further stated that the local manager was responsible for any lost or spoiled grain at any of the twelve elevators.

3

As to the grain merchandiser-track buyer transaction, the grain merchandiser-track buyer bond stated that Coast carried out the business of track buyer in Portland. Kirk Smith, agent and buyer for the Portland office of Coast, also operated out of the same Coast office as Branvold in Great Falls. Smith, however, purchased grain in bulk quantities from commercial grain elevators, Dealers, under what Branvold stated was the track buyer's license. Smith never purchased grain from any of the Farmers. He never used the grain purchase contracts, scale tickets, settlement sheets or checks drawn on the Montana bank. The grain was delivered outside of Montana, either to Coast in Portland or to Lewiston, Idaho. Coast's Portland office paid the freight on this grain to out-of-state destinations and also took responsibility for any losses or spoilage. The contract and settlement sheets for Smith's purchases were all printed and prepared by the Portland office. The Dealers, additionally, received approximately .10¢ per bushel more than what the Farmers received. The Dealers were paid by checks drawn on a Portland bank. None of the Dealer's grain was stored in any of the twelve Montana warehouses.

Between 1981-1982, Coast declared bankruptcy. The State then brought an action against United Pacific Insurance Co., the surety, to recover on the bonds. In February 1985, the State settled the lawsuit for $180,000. It was this money which was distributed pro-rata to the Farmers and Dealers. The Farmers received $163,225 plus accrued interest and the Dealers received $16,745 plus accrued interest.

According to the District Court, the grain dealer-public warehouseman bond was issued in accordance with the Department of Agriculture's bond schedule for public warehouses. Schedule A, Mont.Admin.R. 4.12.1009 (1980). The grain merchandiser-track buyer bond was issued pursuant to

4

the same regulation. The District Court further held that a contingency fund be established for a number of farmers involved in a separate lawsuit to recover under prior year bonds submitted by the surety companies. The attorneys were also awarded fees and costs to be paid out of the accrued interest.

Dealers argue that the Department of Agriculture originally was in error in issuing the licenses because Coast could not be a "track buyer" under the statutes in place at the time. They argue that the Department of Agriculture should not have treated Coast as a single entity operating in two separate capacities. Dealers claim that the District Court therefore should have combined the entire recovery amount and not made a distinction between the Dealers and the Farmers.

Dealers argue that the following definitions apply to this case and show that Coast should have only executed one bond. Section 80-4-201, MCA (1981), provides the following definitions for "agent", "broker", "commission man", "grain dealer," and "track buyer":

> Unless the context requires otherwise, as used in this part, the following definitions apply:
>
> (1) The terms "agent", "broker", and "commission man" include every person, association, firm, and corporation which engages in the business of negotiating sales or contracts for grain or of making sales or purchases for a commission.
>
> . . .
>
> (4) The term "grain dealer" includes every person, firm, association, and corporation owning, controlling, or operating a truck, tractor-trailer unit, or warehouse, other than a public

5

warehouse, and engaged in the business of buying grain for shipment or milling.

. . .

(8) The term "track buyer" includes every person, firm, association, and corporation which engages in the business of buying grain for shipment or milling and which does not own, control, or operate a warehouse or public warehouse.

Further, Dealers argue that although "warehouseman" is not defined in the Montana Code Annotated, the State did promulgate a definition of public warehouse and public warehouseman in Mont.Admin.R. 4.12.1008(b), (1980):

Public Warehouse: Includes any elevator, mill, warehouse, or structure in which grain is received from the public for storage, milling, shipment or handling. The term "Public Warehouseman" shall be held to mean and include every person, association, firm and corporation owning, controlling, or operating any public warehouse in which grain is stored or handled in such a manner that the grain of various owners is mixed together, and the identity of the different lots or parcels is not preserved . . .

Dealers argue that § 80-4-201(4) and (8), MCA (1981), both disallow Coast from being classified as a grain dealer or track buyer because Coast owns and operates the twelve public warehouses in Montana. Therefore, Dealers contend, had the Department of Agriculture acted correctly, all parties in this case would be claiming under the same bond in a pro-rata manner. They cite Fidelity Deposit Co. v. State of Montana (9th Cir. 1937), 92 F.2d 693, for the proposition that the statutes of the state should be incorporated into the terms of the bond. By so doing, the Dealers claim, we

6

should conclude that the bonds were issued erroneously and combine all proceeds to be issued pro-rata.

Dealers claim this Court should ignore the labels placed on the bonds and follow Fidelity Deposit Co., supra, and conclude the bond proceeds were to "protect all individuals dealing with" Coast.

Farmers argue, and we agree, that Coast was operating two distinct grain merchandising businesses at the time the licenses and bonds were issued. We have previously recognized that the Department of Agriculture can require different bonds for the same legal entity. Kohles v. St. Paul Fire & Marine Insurance Co. (1964), 144 Mont. 395, 396 P.2d 724.

We recognize the general rule that "[i]f a bond is executed in accordance with a statutory requirement, then such a statute constitutes a part of the bond as if incorporated in it, and the bond must be construed in connection with the statute." Kohles, 144 Mont. at 398-399, 396 P.2d at 726; see also, General Electric Credit Corporation v. Wolverine Insurance Co. (Mich. 1984), 362 N.W.2d 595, 602; American Surety Co. of New York v. Butler (1930), 86 Mont. 584, 591, 284 P. 1011, 1014. However, this rule is not without exception. The statement in subsection (4) and (8) of § 80-4-201, MCA (1981), that a grain dealer and track buyer may not own, control or operate a warehouse or public warehouse, should be read with consideration that this section begins "[u]nless the context requires otherwise . . . "

Coast purchased the bonds on the same day, from the same agent, to be issued by the same surety. It is clear that the intention of Coast and the Department of Agriculture was, as the District Court noted, to have the grain dealer-public warehouseman bond protect losses by farmers

7

selling grain to one of the twelve public warehouses and have the grain merchandiser-track buyer bond cover losses suffered by commercial dealers selling grain to the Portland office of Coast.

The agent issuing the license for the State may have failed to determine if Coast specifically fit into the definitions under the statute. The bonds do not have an express specific reference to any statute. However, the facts support the decision of the State to require Coast to have two separate surety bonds. By looking at the facts of how Coast was operating, it is clear that they had two separate grain businesses.

We find therefore, under the facts of this case, that the District Court correctly interpreted these bonds under the ambiguous statutes governing grain merchandising and storage, § 80-4-201 et seq., MCA (1981), and accompanying regulations, by determining the intention of the parties when the bonds were purchased. Those intentions were that the grain merchandiser-track buyer bond in the amount of $20,000 was to cover losses of the Dealers, the grain dealer-public warehouseman bond in the amount of $195,000 was to cover losses of the Farmers.

We further note that the statutes referred to by the Dealers were repealed by the Legislature in 1983. The statement made by the Legislature is as follows:

> WHEREAS, the existing statutes regulating certain aspects of the agricultural industry have become antiquated, as well as being contradictory and illogical in their organization.
>
> THEREFORE, it is necessary to extensively revise those statutes and adopt them as new sections.

8

The statutes were originally drafted in 1921 and amended numerous times thereafter. They were indeed illogical and antiquated and as a result, this case has arisen. Due to the technical nature of this confusing legislation we will not disregard the intentions of the parties who originally entered into the surety bond relationship.

We affirm.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices