**ST. PAUL FIRE & MARINE INSURANCE CO., Plaintiff/Counter–Defendant,**

v.

**CEI FLORIDA, INC., CEI Industries, Inc., CEI Midwest, Inc., CEI Southwest, Inc., CEI West Roofing Co., Inc., George J. Cook, John C. Cook, and David C. Rider, jointly and severally, Defendants/Third–Party Plaintiffs,**

v.

**Richard D. FERGUSON and Stirling, Ferguson & Valenti, Third–Party Defendants.**

No. 92–CV–73303–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 31, 1994.

---

Hans H.J. Pijls, Detroit, MI, for plaintiff.

John W. Griffen, Birmingham, MI, David L. Delie, Jr., Troy, MI, for defendants.

### OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

This case comes before the Court on three motions for summary judgment. Plaintiff,

St. Paul Fire & Marine Insurance Company ("St. Paul"), is suing CEI Florida, Inc., CEI Industries, Inc., CEI Midwest, Inc., CEI Southwest, Inc., CEI West Roofing Company, Inc. ("Corporate Defendants") and George J. Cook, John C. Cook, and David C. Rider ("Individual Defendants") to recover premiums due on insurance policies Plaintiff provided to Corporate Defendants. One policy covered workers compensation, and the other so-called "package" policy provided general liability insurance. Plaintiff's claims include the following:

   (1) causes of action against the Corporate Defendants for breach of contract, account stated, quantum meruit, unjust enrichment, reformation, declaratory judgment, setting aside a fraudulent conveyance, and piercing the corporate veil;

   (2) causes of action against the Individual Defendants for reformation, declaratory judgment, setting aside a fraudulent conveyance, and piercing the corporate veil.

Defendants have counterclaimed alleging the following causes of action: declaratory judgment, breach of contract/setoff,[1] fraud and misrepresentation, and reformation.

Defendants have also filed a complaint against Third–Party Defendants Richard D. Ferguson and Stirling, Ferguson & Valenti. Third–Party Defendants are the individual agent and his insurance agency that brokered the insurance deal between Plaintiff and Defendants. Defendants request that Third–Party Defendants compensate them for any liability they may have to Plaintiff on the grounds that Third–Party Defendants were negligent and committed constructive fraud. Third–Party Defendants have counterclaimed alleging open account, fraudulent conveyance and unjust enrichment theories to support recovery of premiums they paid on Defendants' behalf to St. Paul.

Plaintiff filed a motion for partial summary judgment on June 29, 1993. In it, Plaintiff requested that this Court hold the following:

   (1) That Corporate Defendants are jointly and severally liable for back premiums on the workers compensation insurance provided by Plaintiff.

   (2) That CEI Industries, Inc., is liable for all of the workers compensation premiums and that the regional CEI companies are liable for their shares, should the Court not find Corporate Defendants jointly and severally liable.

   (3) That a transfer of CEI West Roofing Co. stock by Individual Defendants to CEI Industries, Inc. in return for unsecured promissory notes should be set aside as a fraudulent conveyance.

   (4) That Defendants' counterclaims with respect to the workers compensation policy be dismissed.

Defendants responded to this Motion on July 16, 1993, and Plaintiff replied on July 27.

Defendants filed a motion for partial summary judgment on June 30, 1993. In it, they asked the Court: (1) to dismiss Plaintiff's claims against the Individual Defendants for breach of contract, account stated, quantum meruit, unjust enrichment, third-party beneficiary rights, M.C.L. § 600.1405 rights, rescission, and waiver and estoppel; and (2) to dismiss as to Corporate Defendants all of the above claims except breach of contract and account stated.

Plaintiff responded on July 27, 1993. In its response, Plaintiff contested the motion only to the extent of the quantum meruit and unjust enrichment claims against the Corporate Defendants.

Third–Party Defendants' motion for summary judgment, also filed on June 30, 1993, asks the Court to dismiss the third-party complaint. Defendants responded on July 16 and Third–Party Defendants replied on July 26.

Having reviewed the papers filed by counsel and after hearing oral argument on October 21, 1993, the Court is now prepared to rule on these motions. This Opinion and Order sets forth that ruling.

---

1. Defendants claim setoffs in the amount of $340,580 and $118,906 for CEI West and CEI Southwest, respectively.

## II. FACTUAL BACKGROUND

### A. THE WORKERS COMPENSATION POLICY PREMIUMS.

The facts in this case are largely undisputed. The CEI family of companies consists of a holding company for the investments of Individual Defendants (CEI Industries) and four regional roofing contractors (CEI Midwest, CEI Florida, CEI Southwest, and CEI West Roofing Co.). Individual Defendants John Cook, George Cook and David Rider own 100% of the stock of CEI Industries. CEI Industries in turn holds 100% of the stock of CEI Midwest. Cook, Cook and Rider own ⅔ of the stock of each of the other three regional companies.[2] The remaining ⅓ of stock in CEI Florida, CEI Southwest and CEI West are held by Ronald Martin, Douglas Reader and Frederick Holland, respectively.

Since as early as 1977, Corporate Defendants had been obtaining their workers compensation insurance policies through Third–Party Defendant Richard Ferguson. Ferguson placed Corporate Defendants' insurance coverage with various carriers over the years. From 1985–89, he placed their workers compensation insurance with AIG Insurance Companies. AIG cancelled Corporate Defendants' coverage effective December 1, 1989.

John Cook was the CEI employee in charge of insurance coverage from 1975–82. In that time period, he does not recall discussing with anyone whether or not Corporate Defendants should each have their own workers compensation policies or a combined policy. John Cook Deposition, p. 17. David Rider was in charge of insurance from approximately 1982–91. He believes that during that time Corporate Defendants had separate policies, but all with the same insurance company. Rider Deposition, vol. 1, p. 94.

Since 1977, Ferguson, however, had been purchasing combined workers compensation policies for Corporate Defendants naming all five CEI companies as named insureds. Ferguson Deposition, p. 154. He assumed that Corporate Defendants wanted a combined policy, because that was what they had before 1977 when his brokering for them started. According to Ferguson, if a specific decision was made between a combined policy or individual policies, it was made prior to 1977. *Id.* at 154.

In November of 1989, in view of AIG's cancellation effective December 1, Ferguson, on behalf of Corporate Defendants, submitted applications for workers compensation insurance to CNA, Reliance, USF & G and St. Paul. Ferguson Deposition, p. 23. Although Ferguson had never before done business with St. Paul, his employer, Stirling, Ferguson & Valenti, had been named "key construction agent" for St. Paul.[3]

As he had done for the previous twelve years, Ferguson requested the issuance of a combined workers compensation policy which included all CEI entities as named insureds. Ferguson Deposition, p. 140; Lane Deposition, pp. 38–39. He presented it to St. Paul as a combined program. Lane Deposition, p. 39.

---

**2.** Two-thirds of CEI West stock was once held by CEI Industries. Both Plaintiff and Third–Party Defendants seek to set aside the conveyance of this stock from CEI Industries to Individual Defendants.

**3.** Defendants rely on Third–Party Defendants status as "key construction agents" for St. Paul to argue that they were acting as agents for St. Paul at all times relevant to this litigation, rather than as independent insurance agents. *See* Defendants' Brief, pp. 2, 8–9. Benjamin Lane of St. Paul, however, explained that "key construction agent" is "a term we use within the construction division to designate certain agents that are able to submit construction business to St. Paul." Lane Deposition, p. 14.

The Court does not believe that Third–Party Defendants were agents of St. Paul when they brokered the deal between Plaintiff and Defendants. Simply because they were eligible to negotiate with St. Paul on behalf of Corporate Defendants does not make them agents of Plaintiff. Because Defendants have not offered any other evidence to contradict Plaintiff and Third–Party Defendants' assertion that at all times in this case Ferguson and his agency were acting as independent insurance agents, this Court holds that Third–Party Defendants were, in fact, independent insurance agents who merely brokered a deal between the CEI companies and St. Paul.

St. Paul submitted a proposal to Ferguson prior to December 1, 1989. Lane Deposition, p. 25. Apparently, St. Paul was the only company to send a written proposal to Ferguson; other companies wanted to provide only partial coverage to Corporate Defendants. Ferguson Deposition, pp. 140–41. Ferguson understood the workers compensation proposal held all CEI companies jointly and severally liable for premiums. *Id.* at 141, 147. Ferguson told St. Paul that Corporate Defendants, through David Rider, had accepted the proposal effective December 1, 1989. *Id.* at 133–34; Lane Deposition, pp. 25–26.[4] Ferguson sent a binder that same day. *See* Defendants' Brief in Opposition to Summary Judgment for Third–Party Defendants, p. 12. Ferguson has testified that as of December 1, 1989, St. Paul had sold to Corporate Defendants workers compensation insurance in accordance with specifications submitted by Ferguson. Ferguson Deposition, p. 148.

A new feature for Corporate Defendants of the St. Paul workers compensation plan was what is known as a retrospective premium endorsement. This modification of the insurance contract would bill Corporate Defendants up to 35% more of the premium it paid at the beginning of the contract year if actual workers compensation costs exceeded estimated costs. Alternatively, if estimates exceeded costs, St. Paul would return up to 40% of the premiums Corporate Defendants paid up front.

The retrospective premium endorsement to the workers compensation policy clearly states the following:

Insurance policies listed in this schedule will be combined with this policy to calculate the retrospective premium. *If the policies provide insurance for more than one insured, the retrospective premium will be determined for all insureds combined, not separately for each insured.*

\* \* \* \* \* \*

After each calculation of the retrospective premium, you will pay promptly the amount due us, or we will refund the amount due you. *Each insured is responsible for the payment of all standard premium and retrospective premium calculated under this endorsement.*

*See* Workers Compensation Policy WV02102171 (emphasis added). All five CEI companies were named insureds on the workers ⋅ compensation policy. Plaintiff's Brief, Exhibit 2.

On December 5, 1989, after Corporate Defendants through Rider and Ferguson had already accepted St. Paul's offer, Ferguson, Benjamin Lane and Larry Lawson of St. Paul, and George Cook, John Cook, David Rider, Douglas Reader, Ronald Martin and Frederick Holland of the CEI companies met at Hilton Head, South Carolina, to discuss how the retrospective premium mechanism would work. Ferguson, Lane and Lawson did not, however, provide a copy of the endorsement which contained the joint and several liability language to any of the CEI representatives; nor did they discuss it with them at that time. Ferguson Deposition, p. 66.

Douglas Reader, president of CEI Southwest, asked Lane, Lawson and Ferguson what his maximum and minimum liability under the retrospective premium would be:

I said, gentlemen, if CEI Southwest['s] workers comp premium for next year is $100,000, I understand my upside to this to be I would pay 60% or $60,000, that would be my exposure. My downside if I have a bad year for losses would be that I would pay $135,000 or 135% of my premium? And all three of them shook their head yes.

Reader Deposition, p. 26.

Although Defendants rely on this exchange to demonstrate that Plaintiff and Third–Party Defendants misrepresented the liability scheme of the workers compensation policy, Reader, John Cook and George Cook all testified that they believe the joint and sever-

---

**4.** Originally, St. Paul wanted Defendants to secure their premium payment with a $300,000 letter of credit. *See* Defendants' Brief, Exhibit 8 (December 1, 1989 letter from Lane to Ferguson). However, this condition was waived in a February 23, 1990 letter from Lane to Ferguson. Defendants' Brief, Exhibit 9. The condition did not affect the effective date of coverage under the policies—December 1, 1989.

al liability problem at the root of this case had been simply overlooked at the December 5, 1989 meeting at Hilton Head.[5]

It is unclear from the record when St. Paul issued the workers compensation policy. Ferguson did not deliver copies of the actual policy to Cook, Cook, Rider, Holland, Martin and Reader until a meeting conducted at the Detroit Athletic Club ("DAC") sometime near April 30, 1990. Cover letters to the policies stated that the important information was in the front; the retrospective premium endorsement, however, was in the back. *See* Defendants' Brief, Exhibit 3; Workers Compensation Policy.

At the DAC meeting, Ferguson did not point out or review the provisions of the retrospective premium endorsement; nor did he discuss the joint and several premium liability language. Ferguson Deposition, pp. 74–76. He did, however, instruct them "to review the policies for their accuracy; and, if they have any questions, to direct them to me at that time or in the future to contact me with questions.... [I] ask[ed] them to review in detail the policies." *Id.* at 75. David Rider, Corporate Defendants' officer in charge of insurance, admitted that he did not follow these instructions. Rider Deposition, vol. 1, p. 111; vol. 2, p. 114.

The workers compensation policy ran from December of 1989 to December of 1990 and was renewed for another year until December, 1991. St. Paul further extended coverage until February 1, 1992. During the entirety of the policy period, the Stirling, Ferguson & Valenti agency invoiced each of the Corporate Defendants individually for their share of the premium as calculated by David Rider. Ferguson Deposition, pp. 63–64. There was never an invoice to any entity for portions owing by any other entity, and there was no disclosure to any entity that sometime in 1991 CEI Midwest was falling behind in its premium payments. *Id.* at 64–65. CEI Midwest eventually went into bankruptcy, and St. Paul ultimately made a demand in early 1992 for payment by all of the Corporate Defendants collectively for the back premiums owed by CEI Midwest. When Defendants rejected this demand, St. Paul commenced this action against the Corporate and Individual Defendants; they in turn filed a counterclaim against Plaintiff and a third-party complaint against Ferguson and his agency.

## B. THE ALLEGED FRAUDULENT CONVEYANCE.

Plaintiff and Third–Party Defendants seek to set aside as a fraudulent conveyance a transfer of CEI West Roofing Co. stock from CEI Industries to Individual Defendants. On December 31, 1990, CEI Industries, represented by David Rider, sold each Individual Defendant 7,000 shares of CEI West Roofing Co. stock. The stock was valued by Coopers & Lybrand to be worth $38.10 per share for a total of $800,100. CEI Industries received in return three unsecured promissory notes for $266,700 from each of the Indi-

---

5. From John Cook's deposition, pp. 47–48:

Q. Do you think that any of the parties intentionally tried to misstate whatever may have been the truth to any of the other parties?
A. I can't—I can't answer that, no. I can't answer that because I don't know. I would never know that.
Q. The question is do you believe it?
A. No.
From Doug Reader's deposition, p. 174 (emphasis added):
Q. Is it your testimony, sir, that Mr. Ferguson intentionally tried to deceive you at that meeting?
A. No, I would not think—I don't think Dick Ferguson—Dick is—
Q. You said earlier he was an honest guy.
A. He is as honest a person as I would ever meet. I think that—*I think this thing got overlooked.*

Q. A miscommunication problem?
A. *I think just plain overlooked and, I guess, I really infer that Lane, Lawson and Ferguson overlooked this.*
From George Cook's deposition, p. 33:
Q. Okay. But if you say that they overlooked certain things and they didn't do their homework properly, that is not the same as saying that they intentionally tried to misstate the terms of the policy; is that correct?
A. Yeah, I agree with you. I don't think they tried to misstate the policy.
Also, from Ferguson's deposition, p. 150:
Q. Is there anything you can point to, any statements made by Mr. Lane or Mr. Lawson, that would make you believe that St. Paul was trying to mislead either you or CEI about the actual terms of the policies that were going to be issued?
A. No.

vidual Defendants. The notes called for no payments between December 31, 1990, and March 1, 1992. For March, 1992, through March, 1994, the notes called for payments of 2% annual interest. For March, 1994, to March, 1996, the notes called for 4% annual interest. During the period 1996–2011, Individual Defendants were to pay a combination of the principal debt plus 6% interest, all based on a 30-year amortization schedule. There was to be large balloon payment of some $750,000 at the end of that period. *See* Plaintiff's Brief, p. 15, Exhibit 5.

According to Plaintiff's unchallenged calculations, CEI Industries gave up $800,100 in current dollars worth of stock in return for unsecured promissory notes at below-market interest rates which promised a balloon payment of roughly $750,000 twenty years down the road. It is also uncontroverted that at the time CEI Industries made the transfer, its liabilities exceeded its assets (including the stock/notes) by $583,697. Plaintiff's Brief, Exhibit 6. Defendants claim that the transaction allowed CEI West Roofing Co. to elect Subchapter S corporate status and thereby receive tax advantages. Furthermore, Defendants argue that the transaction converted a less liquid asset (stocks) into a more liquid asset (notes).

The Individual Defendants to date have made no payments on these notes. They are currently held by First of America Bank. First of America was a secured creditor for CEI Midwest; its loan to CEI Midwest was guaranteed by CEI Industries. When CEI Midwest went bankrupt, First of America took possession of the notes pursuant to its security agreements.

## III. *ANALYSIS*

### A. *THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genu-ine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

---

**6.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure,* § 2727, at 33 (Supp.1993).

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

See *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding the parties' motions for summary judgment.

## B. *PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT.*

### 1. *Plaintiff Is Entitled To Summary Judgment Holding Corporate Defendants Jointly And Severally Liable For Back Premiums on Workers Compensation Policy No. WV02102171.*

█ As noted above, Policy No. WV02102171 clearly provides for joint and several liability as to all named insureds. Moreover, each of the Corporate Defendants are named insureds on the policy. This Court must enforce the plain terms of this insurance contract unless Defendants can show why it should act otherwise. *Vanguard Ins. Co. v. Clarke*, 438 Mich. 463, 475 N.W.2d 48, 52 (1991) ("In the absence of ambiguity, this Court will uphold the clear meaning of an insurance contract that does not violate public policy.").

Defendants make four arguments to stave off joint and several liability on the workers compensation policy. First, they assert that there is an ambiguity in the insurance policies that St. Paul issued to Corporate Defendants. The "package" policy issued by St. Paul to Corporate Defendants at the same time as the workers compensation policy included a document entitled "General Rules."

This document states: "The first named insured is responsible for paying all premiums and will be the one to whom we'll pay any return premiums." Defendants' Brief, Exhibit 5. The first named insured on the workers compensation policy is CEI Industries. Defendants argue that the "General Rules" language quoted above established an uncertainty as to whether CEI Industries or all CEI companies were liable for the entire workers compensation premium.

The Court holds that this statement does not create an ambiguity in the workers compensation policy. At the very top of the "General Rules" document, it states: "These rules apply to the entire policy *unless you're notified otherwise.*" Defendants' Brief, Exhibit 5 (emphasis added). Thus, even if the Court were to hold (1) that the "General Rules" language applied to both the workers compensation and "package" policies, and (2) thereby made only the first named insured, CEI Industries, *generally* liable for premiums, the more specific language of the workers compensation policy's retrospective premium endorsement holding all named insureds jointly and severally liable would still fall within the "notified otherwise" exception also spelled out in the "General Rules." Moreover, Plaintiff correctly points out that what is in one entirely separate contract between the parties does not affect the terms of another contract. The workers compensation policy, which contains the joint and several liability clause and does not include the language Defendants rely upon in arguing that an ambiguity exists, completely governs the dispute in this motion. Finally, Defendants offer no proof that any of them relied upon the "General Rules" provision to their detriment; indeed, none of them claim to have read the document in which it is contained.

█ Defendants' second argument by which they seek to avoid joint and several liability is that each Corporate Defendant received separate billings for workers compensation premiums. This practice, Defendants argue, corroborated their understanding that each CEI company was liable only for its share. They therefore urge the Court

to estop Plaintiff from invoking the joint and several liability clause.

The record reveals, however, that this division of billing was done at the direction of Individual Defendant David Rider. Ferguson Deposition, pp. 63–64. Therefore, Defendants cannot argue that the separate billings undermine joint and several liability. The separate billings were merely the result of Defendants' own request.

■ Additional support for the holding that Defendants could not reasonably rely on separate billing to mean that they were not jointly and severally liable for workers compensation premiums can be found in the exposure graphs presented by Ferguson at the December 5, 1989 Hilton Head meeting. *See* Plaintiff's Brief, Exhibits 3 & 4. These graphs show the Corporate Defendants' estimated maximum and minimum exposure on the workers compensation policy. Importantly, they do not break the figures down company-by-company. The graphs, therefore, support Plaintiff's argument that Defendants knew or should have known they were jointly and severally liable.

■ Defendants' third argument is that St. Paul did not submit to them a form allegedly required by the National Council on Compensation Insurance. The form is a notification to the insurer that the insured elects coverage under a retrospective rating plan. It states as follows:

> The undersigned certifies that the named insured has elected the use of the retrospective rating plan as detailed below. It is also certified that the insured understands all terms, conditions, and provisions of the plan, including the method of premium computation, payment and penalties for cancellation.

Defendants' Brief, Exhibit 4. Although Plaintiff apparently did not use this form, Defendants have not pointed to any law or facts indicating that Plaintiff was required to do so. Nor did Defendants even provide any evidentiary support to establish that the use of this form is, in fact, a standard in the insurance industry. Thus, this form provides no legal defense to an insurance contract provision that is clear on its face.

■ Finally, Defendants argue that Plaintiff and Third–Party Defendants are guilty of constructive fraud by not specifically identifying the joint and several liability provision, and by indicating to Defendants at the Hilton Head meeting that each operational entity was liable for its own premium. Defendants concede, as they must considering the deposition testimony quoted *supra* n. 5, that there was no intent to defraud Defendants by either Plaintiff or Third–Party Defendants. Nonetheless, they still argue that constructive fraud in this case exists. They cite in support of this contention *Goodrich v. Waller*, 314 Mich. 456, 22 N.W.2d 862, 867 (1946) ("The law is established in this State that false and fraudulent representations are actionable, although made innocently and in good faith, where the representations are relied upon and result in loss to the other party and in benefit to the person making them.") and *United States Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 449, 460 (E.D.Mich.1972) (intent to deceive is not a requirement to prove constructive fraud and liability may be premised on negligence or even innocent misrepresentation), *aff'd*, 509 F.2d 1043 (6th Cir.1975).

■ While Michigan does not have a cause of action for "constructive fraud" *per se*, it does recognize the torts of innocent misrepresentation and silent fraud. The Michigan Supreme Court carefully outlined these actions/defenses in *U.S. Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981). In *Black*, the plaintiff was an insurance company that sought to collect on construction bonds it provided. The plaintiff sued the developers of a project after the contractor defaulted on its obligations and thereby forced the plaintiff to settle claims. The developers had signed as sureties on the construction bonds, but did so after a representative of the plaintiff assured them that other conditions of the bonds had been met. These conditions included the signatures of a number of other would-be sureties, several of whom had in fact not yet signed surety agreements. 313 N.W.2d at 79–81.

The *Black* court began by setting forth the elements of an innocent misrepresentation claim:

[I]t is held that where an action is brought to recover for false and fraudulent misrepresentations made by one party to another (1) in a transaction between them, (2) any representations which are false in fact (3) and actually deceive the other, and (4) are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, (5) where the loss of the party deceived inures to the benefit of the other.

313 N.W.2d at 84 (citations to materials quoted from omitted). In distinguishing intentional and innocent misrepresentation, the court added:

Briefly, then, while the traditional and innocent misrepresentation actions are substantially similar, they are also significantly different. On the one hand, the innocent misrepresentation rule differs in eliminating scienter and proof of the intention that the misrepresentation be acted upon. However, on the other hand, the innocent misrepresentation rule adds the requirements that the misrepresentation be made in connection with making a contract and the injury suffered must inure to the benefit of the misrepresenter. Actually what this means is this: while it is unnecessary to show that the innocent misrepresenter knew his representation was false, it is necessary to show that not only does the victim suffer injury, but also the injury must inure to the misrepresenter's benefit. It also means ... that it is unnecessary to prove separately that the misrepresenter intended that the victim rely on the misrepresentation, because the misrepresentation must be made "in a transaction between them" where the misrepresenter should realize that the misrepresentation would be relied upon. This was implicitly recognized in *Boss v. Tomaras*, 241 Mich. 540, 543, 217 N.W. 783 (1928), where this Court held:

It was unnecessary for plaintiffs to prove fraudulent purpose or intent upon the part of defendants, or those representing them. If defendants made representations to plaintiffs with reference to the value and condition of the farm and the personal property, and plaintiffs relied and acted upon them to their damage, and they were false, *the purpose or intention of defendants in making the representations would be immaterial.* (Emphasis added.)

313 N.W.2d at 85. The *Black* court remanded the case for further proceedings to determine if the defendants reasonably relied on the misrepresentations made by plaintiff in signing as sureties to the construction bonds. 313 N.W.2d at 91.

■ Thus, although Defendants are correct that under *Black* they need not show an intent to deceive on the part of Plaintiff or Third–Party Defendants to make out a defense of innocent fraud, they are required to show that a misrepresentation was made during contract formation and also that they reasonably relied on the statement.

This they have not done. In terms of the contract formation element, it is uncontroverted that, with the approval of Corporate Defendants' insurance overseer, David Rider, Ferguson accepted St. Paul's offer of coverage on or about December 1, 1989. Ferguson Deposition, pp. 133–34. Coverage was effective that same day. Although initially there was a condition that Corporate Defendants obtain a $300,000 letter of credit to secure the premiums it would owe St. Paul, such condition was later waived, and, importantly, the condition at no point impeded the execution of the contract. Therefore, Defendants could not have relied upon the alleged misrepresentations at the Hilton Head meeting on December 5, 1989, in making a contract because the contract was already in effect before the meeting started.[7]

■ Even assuming, *arguendo*, that Plaintiff and Defendants were still in the contract formation stage at the time of the

---

7. *But see Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1028 (2d Cir.1991) ("A[n insurance] contract is formed when the insured accepts a policy and pays the premium and the insurer accepts the premium."), *cert. denied,* —— U.S. ——, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); *House v. Billman,* 340 Mich. 621, 66 N.W.2d 213, 216 (1954) (" 'An insurance policy when issued and delivered becomes the contract between the parties.' ") (citation to quoted material omitted).

December 5, 1989 meeting, the Court does not believe that there is a question of material fact on whether Defendants reasonably relied upon the alleged misrepresentation made by Ferguson and St. Paul's agents at the Hilton Head meeting. As noted above, *Black* reiterated the requirement that a party invoking innocent misrepresentation must show reasonable reliance. 313 N.W.2d at 91. Furthermore, Defendants must show reasonable reliance, as with all elements of fraud, by "clear, satisfactory, and convincing proof." *Youngs v. Tuttle Hill Corp.*, 373 Mich. 145, 128 N.W.2d 472, 473 (1964); *see also Black*, 313 N.W.2d at 90.

Defendants base their reliance argument on the following testimony of Douglas Reader:

> I did ask the question, and I have a tendency to break things down fairly simple, stupid. I said, gentlemen, if CEI Southwest['s] workers comp premium for next year is $100,000, I understand my upside to this to be that I would pay 60% or $60,000, that would be my exposure. My downside, if I have a bad year for losses would be that I would pay $135,000 or 135% of my premium? And all three of them [Ferguson, Lane, and Lawson] shook their head yes.

Reader Deposition, p. 26. However, Reader also stated:

> Q. And then when you asked the question at the Hilton Head meeting it was not asked to find out whether you would ever be liable for premiums of [CEI] Florida, Midwest and West, correct?
>
> A. I don't think the question was thought of that way at that time. The question was—
>
> Q. I don't think so.
>
> A. No, that is—it was not thought of in that way at the time. The whole, the purpose of the question was to determine my minimum and maximum exposure. In hindsight looking at it, also included in my minimum and maximum exposure was if those gentlemen understood this policy then to be joint and several, they should have spoken up.

*Id.* at 41–42. Thus, at the time of the Hilton Head meeting, no one in the room was thinking along the lines of joint and several liability. *See also supra*, n. 5 (testimony from George Cook and Douglas that joint and several liability was "overlooked" by the participants of the meeting). Defendants, therefore, could not have reasonably relied upon statements which did not envision something that was never discussed or even considered.

This case is similar to *Smart v. New Hampshire Ins. Co.*, 148 Mich.App. 724, 384 N.W.2d 772 (1985), *aff'd* 428 Mich. 236, 407 N.W.2d 362 (1987). In that case, the insureds claimed that their broker misrepresented to them the time their new fire insurance coverage was to commence. When a fire broke out on the insureds' property before the policy began, they sought to recover their losses from the broker and his agency. The court held:

> In the instant case, there was no evidence of any misrepresentations on the part of [the agency] or [the broker]. By [the insureds'] own admissions, [the agency] and [the broker] made no misrepresentations to them *because there was never any conversation regarding the time of inception of the [the new fire insurance] policy.*

384 N.W.2d at 777. In the same way in this case there was no misrepresentation on joint and several liability because, by Defendants' own admissions, the issue was never directly discussed.

Further evidence that Defendants could not have reasonably relied upon any alleged misrepresentation comes from other portions of Douglas Reader's testimony. Reader admitted that Defendants understood that provisions of previous workers compensation policies would carry over to the St. Paul coverage:

> Q. [ ] As far as whether you as Southwest would ever be liable for premiums of West, Midwest or Florida, it was not in your mind any different than what it would have been on a previous policy, correct?
>
> A. That is correct.

Reader Deposition, p. 43.

This testimony is important because it is undisputed that Corporate Defendants had,

since at least 1977, purchased combined workers compensation coverage with joint and several liability for all of the named insureds. Ferguson Deposition, pp. 67–68, 153–54. At the time of the Hilton Head meeting, then, Defendants knew or should have known of the joint and several liability provision in their prior policies. *House v. Billman,* 340 Mich. 621, 66 N.W.2d 213, 216 (1954) ("In the absence of fraud, insured is held to a knowledge of the conditions of his policy, even though he may not have read it."). Furthermore, Reader's additional testimony shows that Defendants understood the terms of prior policies would carry forward to the St. Paul policy. Because Defendants had constructive knowledge of the joint and several liability of earlier policies, and because Reader testified that Defendants understood that prior policy terms would carry forward, Defendants could not have *reasonably* relied upon the alleged statement to the contrary at the Hilton Head meeting.

■ To the extent that Defendants argue that Plaintiff was illegally silent with respect to the joint and several liability provision in the workers compensation policy, such a claim also must fail. *Black* also defined Michigan's law on silent fraud:

> It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions," ... since "a suppression of the truth may amount to a suggestion of falsehood." ... *In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.*

313 N.W.2d at 88 (citations to quoted material omitted).[8]

As an initial matter, Plaintiff was *not* silent on the joint and several liability provision—it was written in plain English in the copies of the policy which Defendants received from Ferguson on April 30, 1990, at the DAC meeting. In addition, Ferguson specifically urged Defendants to review the policy in full and ask him any questions they might have. Just because Defendants did not heed this advice, and thereby discover the joint and several language, does not mean that Plaintiff was illegally silent about this language.

■ Even assuming that Plaintiff was silent on the joint and several liability provision, Defendants have not identified any duty on the part of St. Paul to disclose it to them.[9] Without evidence of such a duty, the Court must hold that there was no silent fraud by St. Paul.

■ As noted recently by the Sixth Circuit, "generally, the law of Michigan places a duty upon an insured to read the policy and air any discrepancies in coverage within a reasonable time after issuance of the policy." *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1494 (6th Cir.1991). The Court sees no reason why this rule should not apply to other parts of the policy, including liability clauses. Defendants, then, bore the burden of discovering the joint and several liability clause in the workers compensation policy; they should not be allowed to shift this duty to St. Paul simply because something has gone awry.

■ Given that none of Defendants' arguments against joint and several liability succeed, the Court will enforce the plain terms of the workers compensation insurance contract, Policy No. WV02102171, and hold

---

**8.** *Black* went on to state that if a party to a contract knows, or should know, that the other party or parties are relying upon earlier representations, they have a duty to come forward with information of changed circumstances. In the court's words:

> It is a general rule "that a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading,

previous representations which, when made, were true or believed to be true."

313 N.W.2d at 89 (citation to quoted material omitted). In *Black,* the court held that it was unclear from the record if the representatives of the insurance company in that case had fulfilled this duty; the court therefore remanded the case to the trial court for further proceedings on the silent fraud claim, as well as on the innocent misrepresentation claim discussed above. 313 N.W.2d at 89, 92.

**9.** Whether Third–Party Defendants had a duty to disclose is discussed *infra.*

CEI Industries,[10] CEI Florida, CEI Michigan, CEI Southwest, and CEI West Roofing Co. jointly and severally liable for back premiums owing under that policy.[11]

### 2. The Transfer Of CEI West Stock From CEI Industries To John Cook, George Cook And David Rider Is A Fraudulent Conveyance Under M.C.L. § 566.14.

■ Plaintiff and Third–Party Defendants seek to set aside CEI Industries' transfer of CEI West stock to John Cook, George Cook, and David Rider under M.C.L. § 566.14, which states:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

In order to set aside a conveyance under this section, then, a court must determine that there was not fair consideration *and* that the conveyor was insolvent.

■ The starting point for determining what is fair consideration is M.C.L. § 566.13, which states that fair consideration is given for property or an obligation:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

In *In re Otis & Edwards, P.C.*, 115 B.R. 900, 907–08 (Bankr.E.D.Mich.1990), Chief Bankruptcy Judge Graves of the Eastern District of Michigan carefully interpreted M.C.L. § 566.13:

This court reads § 566.13 to require a finding that the values exchanged were equivalent *and* that the transferee acted in good faith. If a finding of fair equivalence is made, the court must determine whether the transferee acted in good faith. Where the debtor does not receive fair equivalence or where the transferee fails to act in good faith, this court will make a finding that the debtor did not receive fair consideration.

Chief Judge Graves further indicated what he meant by "fair equivalence:"

[B]efore this court can determine whether fair consideration was received by the debtor it must consider the following:

10. Defendant CEI Industries argues that it should not be liable under the workers compensation policy because it derived no benefits from that policy. Defendants' brief cites *Sturdivant v. Chapman*, 146 Ga.App. 26, 245 S.E.2d 311, 313 (1978) in support of this proposition.

As an initial matter, Defendants have cited no Michigan law, nor has the Court been able to find any, in accord with *Sturdivant*.

Moreover, *Sturdivant* also supports the argument that the company that solicits insurance for a family of companies is liable for the entire premium. In *Sturdivant*, a single company, Roddy Sturdivant Enterprises, Inc., purchased a package of insurance policies for a family of companies. 245 S.E.2d at 312. The appellate court affirmed the trial court's determination that only those companies which had derived a benefit from the different insurance policies should be liable for the premiums on those different policies. 245 S.E.2d at 313. However, *Sturdivant* also held: "The [trial] court did not err in concluding that the defendant Roddy Sturdivant Enterprises, Inc. is under appropriate agency and contract principles liable for the total premiums earned." 245 S.E.2d at 313. Thus, in *Stur-*

*divant* the company that arranged for the insurance was liable for all of the premiums.

The Court believes this rule should apply in this case. CEI Industries, through David Rider, asked Richard Ferguson to acquire new workers compensation insurance for the CEI family of companies. That CEI Industries has no employees is, therefore, of no matter to its liability because CEI Industries is the company that arranged the insurance.

Finally, and most importantly, the Court notes that CEI Industries did in fact receive a benefit from the insurance of the other CEI companies. Part of its holdings included stock in the other CEI companies. *See* Plaintiff's Exhibit 6 (indicating investments in unconsolidated subsidiaries). Therefore, having those companies insured increased the value of CEI's assets.

11. This ruling negates Defendants' declaratory judgment, fraud, and reformation counterclaims with respect to the workers compensation policy. The setoff counterclaim, however, has not been briefed or argued by the parties, and therefore it remains for trial.

(1) whether the transaction was conducted at arms length;

(2) what property or rights were transferred to the debtor;

(3) whether the debtor received additional valuable benefits as a result of the transaction; and

(4) whether the debtor has been rendered "execution proof."

115 B.R. at 909–10. If fair equivalence is shown, a court must next inquire into the question of good faith. If there is no fair equivalence, a good faith inquiry is unnecessary.

Applying these principles to this case, the Court finds that CEI Industries did not receive fair consideration for the CEI West Roofing Co. stock because the notes it received from the Individual Defendants were not fairly equivalent to the stock it transferred. As an initial matter, the transaction was not done at arms length because David Rider, one of the recipients of the stock, acted on behalf of CEI Industries. Rider Deposition, vol. 1, p. 40. Moreover, CEI Industries received in return for valuable stock only three unsecured promissory notes, with the bulk of the notes not payable until the year 2011. While Defendants assert that the transfer allowed CEI West to elect Subchapter S status under the Internal Revenue Code, this did not provide any benefit whatsoever to CEI Industries because it now did not own the CEI West stock. Finally, the transfer made it more difficult for creditors to collect on the debts of CEI Industries because a tangible existing asset, stock, was traded for the unsecured promise by three individuals to pay money, most of which was not due until 2011.

Turning to the insolvency prong of Michigan fraudulent conveyance law, once the party attacking the conveyance demonstrates that it lacked fair consideration, the burden shifts to the other party to show that it was not insolvent. 115 B.R. at 911. M.C.L. § 566.12(1) states:

A person is insolvent when the present saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

Chief Bankruptcy Judge Graves commented on this section as well: "In other words, either just before or just after the transfer, the debtor must have been unable to make ultimate payment of then-existing obligations from then-existing assets." 115 B.R. at 911.

Defendants have come forward with no evidence that CEI Industries was not insolvent when the stock transfer occurred. Indeed, no such evidence exists; CEI Industries' balance sheet for December 31, 1990— the date of the transaction—clearly shows that current assets equalled $296,968, total assets equalled $1,321,186 and current and total liabilities equalled $1,904,884. *See* Plaintiff's Brief, Exhibit 6.

Because the transfer of the stock was not made for fair consideration and occurred when CEI Industries was insolvent, this Court sets it aside as a fraudulent conveyance under M.C.L. § 566.14. The Individual Defendants are to return the stock to CEI Industries; the promissory notes are null and void; and the creditors of CEI Industries are left to resolve any competing priorities over the stock.

3. *Plaintiff Has Failed To Present Enough Evidence That Individual Defendants Should Be Held Jointly And Severally Liable For CEI Industries' Obligations Because CEI Industries Was The Alter Ego Of Individual Defendants.*

Plaintiff also seeks to hold Individual Defendants jointly and severally liable for the workers compensation premiums CEI Industries owes on the ground that CEI Industries was the alter ego of Individual Defendants. In support of its request, Plaintiff relies upon the fraudulent conveyance struck down above, and also a statement by David Rider that "CEI, George, John, and Dave are one and the same." Rider Deposition, vol. 1, p. 54.

While considering this a close question, the Court does not believe that these facts, without more, support a legal finding that CEI Industries was the alter ego of Individual

Defendants. *Comer Family Equity Trust v. United States,* 732 F.Supp. 755 (E.D.Mich. 1990), *aff'd* 1992 WL 139645, 1992 U.S.App. LEXIS 15124 (6th Cir.1992) sets out the test this Court uses in determining whether to pierce the corporate veil. The *Comer* court stated:

> "Where a corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored." ... In determining whether to disregard a corporate entity for purposes of ascertaining debt liability, courts look to
>
>> (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators....
>
> Factors to be considered include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham....
>
> The above factors are not, however, all inclusive and "[t]he entire spectrum or relevant fact forms the background for such an inquiry...."

732 F.Supp. at 759 (citations to quoted material omitted).

Applying this test to the facts of the case, Plaintiff has not, at this time, come forward with sufficient evidence to warrant piercing the corporate veil. There is no evidence that the Individual Defendants failed to abide by corporate formalities or keep separate corporate records. Furthermore, the Court believes that the injustice done to Plaintiff by not piercing the corporate veil is minimal. The Court has already held that the Corporate Defendants are jointly and severally liable for all workers compensation policy premiums. According to the latest submission by counsel, the Corporate Defendants have a net worth in excess of $1,000,000. *See* Plaintiff's Motion for Reconsideration of Sanction Opinion, p. 8. Plaintiff will therefore be able to recover workers compensation premiums

in full without any need for a contribution from the Individual Defendants. The Court has also set aside the fraudulent conveyance upon which Plaintiff relies most in support of its motion to pierce the corporate veil. This ruling should further permit Plaintiff's collection from the Corporate Defendants. Given Defendants' observation of corporate formalities and the lack of injury Plaintiff would suffer if the corporate veil is left intact, the Court refuses, on the record to date, to hold the Individual Defendants jointly and severally liable for workers compensation premiums on Policy No. WVO2102171. However, the Court will permit this issue to proceed to trial, and if Plaintiff provides additional evidentiary support sufficient to meet the legal standards outlined above, the Court will consider a motion at that time.

## C. *DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT.*

■■ Defendants ask this Court to dismiss Plaintiff's quantum meruit and unjust enrichment claims against Corporate Defendants. Plaintiff concurs if the Court holds that Corporate Defendants are liable in contract to St. Paul. Because the Court has so held, the Court therefore grants Defendants' Motion in part and dismisses Plaintiff's quasi-contract claims on the workers compensation policy.

The Court, however, denies Defendants' motion with respect to the "package" policy issued by Plaintiff. Liability under this policy is not yet before the Court; it would thus be premature to dismiss Plaintiff's quasi-contract claims on this policy.

## D. *THIRD–PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.*

■■ In their Third–Party Complaint, Defendants seek to transfer any liability they may have to Plaintiff to Third–Party Defendants Richard Ferguson and his agency, Stirling, Ferguson & Valenti. Defendants cite two legal theories, negligence and constructive fraud. Third–Party Defendants have filed a motion for summary judgment on these claims.

The Court's discussion *supra* indicates that Defendants' constructive fraud claim should be treated as a claim of innocent misrepresentation and/or silent fraud. The Court has already held that there was no innocent misrepresentation at the Hilton Head meeting. If Third–Party Defendants are found liable to Defendants, then, it will be because, under a silent fraud and/or negligence theory, they owed a duty to Defendants to inform them of the joint and several liability provision of the workers compensation insurance.

It is well-established in Michigan that:

Generally, an insurance agent does not have an affirmative duty to advise a client regarding the adequacy of a policy's coverage. Instead, the insured is obligated to read the policy and raise questions concerning coverage within a reasonable time after issuance.

*Bruner v. League General Ins. Co.*, 164 Mich. App. 28, 416 N.W.2d 318, 320 (1987).[12] There is, however, one exception to this rule, which is spelled out in *Stein, Hinkle, Dawe & Assocs., Inc. v. Continental Casualty Co.*, 110 Mich.App. 410, 313 N.W.2d 299, 302 (1981).

In that case, the insured was an architectural and engineering firm which had acquired all of its insurance over a ten-year period through a single insurance agency. That agency was also an agent for the insurance company. In 1969, due to a lack of business, the insured cancelled its professional malpractice coverage. The insurance agency did not at that time inform the insured that their insurance would not cover them for claims that came in following the covered period—even if the claims arose from negligent acts that occurred in the covered period. In 1971, when the insured renewed its malpractice insurance seeking protection "against all liabilities," the insurance agency did not inform it that unless it elected a "prior acts" endorsement there might still be claims that would be uncovered. 313 N.W.2d at 301–02.

The *Stein* court stated:

An insurance agent does not generally have an affirmative duty to advise a client

about the adequacy of a policy's coverage. *Palmer v. Pacific Indemnity Co.*, 74 Mich. App. 259, 267, 254 N.W.2d 52 (1977); *Hardt v. Brink*, 192 F.Supp. 879, 880 (W.D.Wash.1961). However, *where a special relationship exists with the insured, an agent has the duty to advise the insured.* *Palmer, supra*, 74 Mich.App. at 267, 254 N.W.2d at 53; *Hardt, supra*, 881. In *Hardt*, defendant insurance agent had procured all of plaintiff's insurance for ten years. Plaintiff, a manufacturer, bought a fire insurance policy which excluded any buildings leased by plaintiff. When a building leased by plaintiff was damaged by fire, plaintiff was unable to recover under the insurance policy and brought an action against the agent. The court found that the agent had a duty to advise stating:

Whether or not an additional duty [to advise] is assumed will depend upon the particular relationship between the parties. Each case must be decided on its own peculiar facts. The law here involved is not particularly startling nor is it necessarily an extension over previous cases. This is an age of specialists and as more occupations divide into various specialties and strive towards "professional" status the law requires an ever higher standard of care in the performance of their duties. Restatement (Second) Torts (Tent.Draft No. 4, 1959) § 299A.

*Id.* at 881.

The existence of a special relationship is a question of fact. *Palmer, supra*, 74 Mich. App. at 267, 254 N.W.2d 52. Where the duty to advise has been breached, the insurance agent is liable for any damages resulting from the breach. *Hardt, supra*, 882.

*Stein*, 313 N.W.2d at 302 (emphasis added).

Applying the special relationship test set out above, *Stein* went on to hold that the trial court's finding of a special relationship on the basis of the ten-year association between the insured and the insurance agency was not clearly erroneous. The court also affirmed the jury verdict that the insurance

---

**12.** As noted above, the Court believes that this principle extends to other elements of an insurance policy, such as joint and several liability for all named insureds.

agency had breached its duty to advise. 313 N.W.2d at 303.

Defendants rely upon *Stein* to hold Ferguson and his agency liable for any premiums they owe to St. Paul on a joint and several basis. They argue that Ferguson alone had brokered all of their insurance since 1977 and therefore had a special relationship to them. From this special relationship arose a duty to advise them of the joint and several liability on the St. Paul workers compensation coverage, which Ferguson allegedly breached. Defendants stress that Ferguson had every incentive to be less than candid with them because he and his agency would continue to receive lucrative commissions if they successfully placed Corporate Defendants' workers compensation insurance for another year or more.

The Court believes that there are material questions of fact regarding (1) whether Third–Party Defendants had a "special relationship" with Defendants, and (2) if they did, did they breach their duty to disclose to Defendants by not pointing out to them the joint and several liability clause in their workers compensation policy. Although there is evidence that Corporate Defendants were not naive insurance customers,[13] the fact remains that they purchased all of their insurance through Ferguson and his agency since 1977. Furthermore, it is undisputed that Third–Party Defendants benefitted in the form of commissions by continuing to broker Defendants' coverage. For the present motion, the Court must also accept as true Defendants' assertion that had they known of the joint and several liability clause they might well have cancelled or renegotiated the St. Paul policy. *See* Third–Party Plaintiffs' Response Brief, p. 8; *see also* George Cook Deposition, p. 66. Taking all these factors together, the Court believes that a reasonable jury could conclude that Third–Party Defendants owed a duty to advise to Defendants, and that they breached that duty by not flagging the joint and several liability provision. Summary judgment to Third–Party Defendants is, therefore, inappropriate.

## IV. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that

(1) Plaintiff's Motion for Partial Summary Judgment is GRANTED with respect to the following:

(a) Corporate Defendants are jointly and severally liable to Plaintiff for workers compensation premiums owed on Policy No. WVO2102171;

(b) The conveyance of CEI West Roofing Co. stock to Individual Defendants is stricken as a fraudulent conveyance; the stock should be returned to CEI Industries, Inc.

(c) Defendants' counterclaims with respect to the workers compensation policy are dismissed, with the exception of their setoff counterclaim.

(2) Plaintiff's Motion for Partial Summary Judgment is DENIED with respect to holding Individual Defendants personally liable for premiums owed.

(3) Defendants' Motion for Partial Summary Judgment is GRANTED, with the exception that Plaintiff's quantum meruit and unjust enrichment claims are alive as to any insurance it provided other than Policy No. WVO2102171.

(4) Third–Party Defendants' Motion for Summary Judgment is GRANTED with respect to innocent misrepresentation, but DENIED with respect to silent fraud and negligence.

What remains in this case, then, is (1) determining the extent of damages Corporate Defendants owe Plaintiff St. Paul on Policy No. WVO2102171, minus any enforceable setoffs, and (2) whether Defendants can recover any of this amount from Third–Party Defendants. St. Paul's claims and Defendants' counterclaims with respect to the "package" policy are also still alive. Finally,

---

**13.** *See* Rider Deposition, vol. 1, pp. 90–91. In these pages, Rider admitted that he had on numerous occasions in the past sought insurance advice from other agencies and carriers, in part "to keep Ferguson honest."

Third–Party Defendants' Counterclaim against Defendants is still pending.